Volume 1 of 2

**OPINION ON REHEARING EN BANC**
**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

Timothy Lanier Allen,
           *Petitioner-Appellant,*

v.

R. C. Lee, Warden, Central Prison,
Raleigh, North Carolina,
           *Respondent-Appellee.*

No. 02-5

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CA-97-959-5-H-HC)

Argued: June 4, 2003

Decided: April 28, 2004

Before WILKINS, Chief Judge, and WIDENER, WILKINSON,
NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, MOTZ,
TRAXLER, KING, GREGORY, and SHEDD, Circuit Judges.

Affirmed in part and dismissed in part by published opinion. Judge
Gregory wrote the opinion for the court in Parts I, II, III, and IV, in
which Chief Judge Wilkins and Judges Wilkinson, Niemeyer, Wil-
liams, Michael, Motz, Traxler, King, and Shedd joined. Judge Luttig
wrote a separate opinion concurring in the judgment entered in those
parts. Judge Niemeyer wrote the opinion for the court in Part V, in
which Chief Judge Wilkins and Judges Wilkinson, Williams, Traxler,

and Shedd joined. Judge Luttig wrote a separate opinion concurring in the judgment entered in this part. Judge Gregory wrote a separate opinion dissenting from Part V, in which Judges Michael, Motz, and King joined.

Reversed on the *McKoy* issue by a per curiam opinion, in which Chief Judge Wilkins and Judges Michael, Motz, Traxler, King, Gregory, and Shedd concurred. Chief Judge Wilkins wrote a separate opinion concurring in the judgment on this issue, in which Judge Motz joined. Judge Traxler wrote a separate opinion concurring in the judgment on this issue, in which Judge Shedd joined. Judge Gregory wrote a separate opinion concurring in the judgment on this issue, in which Chief Judge Wilkins and Judges Michael, Motz, and King joined. Judge Niemeyer wrote a separate opinion dissenting from the judgment on this issue, in which Judge Wilkinson joined. Judge Luttig wrote a separate opinion dissenting from the judgment on this issue. Judge Williams wrote a separate opinion dissenting from the judgment on this issue.

Judge Widener heard oral argument in this case but later recused himself and did not participate in the decision. Judge Duncan did not participate in this case.

## COUNSEL

**ARGUED:** John Richard Rittelmeyer, HARTZELL & WHITEMAN, L.L.P., Raleigh, North Carolina, for Appellant. Jonathan Porter Babb, Sr., Special Deputy Attorney General, Steven Franklin Bryant, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Gretchen M. Engel, CENTER FOR DEATH PENALTY LITIGATION, INC., Durham, North Carolina, for Appellant. Roy Cooper, Attorney General of North Carolina, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

## OPINION

PER CURIAM, announcing the judgment of the court:

Timothy Lanier Allen was convicted of first-degree murder in a North Carolina court and sentenced to death. Following exhaustion of his rights of review in the North Carolina courts, Allen filed a petition for a writ of habeas corpus in the district court. The district court denied all relief and certified the appealability of several issues. *See* 28 U.S.C. § 2253(c).

On appeal, Allen contends (1) that the short-form indictment used by the State was unconstitutional; (2) that the prosecution withheld, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), jail records that indicated Allen was receiving daily doses of anti-withdrawal medication; (3) that the error in the jury verdict form and jury instructions during the sentencing phase of Allen's trial, which the North Carolina Supreme Court had found to be error but harmless error under *McKoy v. North Carolina*, 494 U.S. 433 (1990), was in fact not harmless error; and (4) that Allen made a *prima facie* showing that his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986) (prohibiting the prosecution from using peremptory challenges in a racially discriminatory matter), were violated during jury selection in his State trial and that a *Batson* hearing should be held. Having heard this appeal *en banc*, the court decides as follows on each of these issues:

For the reasons given in Parts I-IV of the opinion written for the court by Judge Gregory, the court denies a certificate of appealability with respect to Allen's first claim and dismisses that claim, and the court affirms the district court with respect to the second claim. Chief Judge Wilkins and Judges Wilkinson, Niemeyer, Williams, Michael, Motz, Traxler, King, and Shedd join in Parts I-IV. Judge Luttig wrote a separate opinion concurring in the judgment on these two claims.

For the reasons given in Part V of the opinion written for the court by Judge Niemeyer, the court affirms the district court on Allen's *Batson* claim. Chief Judge Wilkins and Judges Wilkinson, Williams, Traxler, and Shedd join in Part V. Judge Luttig wrote a separate opinion concurring in the judgment on this claim. Judge Gregory wrote a

separate opinion, dissenting from Part V, in which Judges Michael, Motz, and King join.

   With respect to Allen's claim under *McKoy v. North Carolina*, 494 U.S. 433 (1990), the court concludes that the district court erred in rejecting the claim. In *State v. Allen*, 417 S.E.2d 227 (N.C. 1992), the North Carolina Supreme Court held that the North Carolina trial court's instructions on unanimity given to the jury during the sentencing phase was "error pursuant to *McKoy*" but that the error was "harmless beyond a reasonable doubt." *Id.* at 228. The court holds that the North Carolina Supreme Court's conclusion that the *McKoy* error was harmless beyond a reasonable doubt resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court, *see* 28 U.S.C. § 2254(d)(1), and that the error was not harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). For this reason, the court vacates Allen's death sentence and remands this case to the district court with instructions to issue a writ of habeas corpus releasing Allen from a sentence of death, unless the State of North Carolina commences proceedings to resentence him within a reasonable time. Chief Judge Wilkins and Judges Michael, Motz, Traxler, King, Gregory, and Shedd concur in this judgment on the *McKoy* claim, and Judges Wilkinson, Niemeyer, Luttig, and Williams dissent from the judgment. Chief Judge Wilkins wrote an opinion concurring in this judgment, in which Judge Motz joins. Judge Traxler wrote an opinion concurring in this judgment, in which Judge Shedd joins. Judge Gregory wrote an opinion concurring in this judgment, in which Chief Judge Wilkins and Judges Michael, Motz, and King join. Judge Niemeyer wrote an opinion dissenting from this judgment, in which Judge Wilkinson joins. Judge Luttig wrote an opinion dissenting from this judgment. And Judge Williams wrote an opinion dissenting from this judgment.

GREGORY, Circuit Judge, writing for the court in Parts I through IV:

I

   Timothy Lanier Allen, an African American, was tried and convicted of first-degree murder for killing Raymond E. Worley, a Caucasian North Carolina State Highway Patrol officer. At trial, the State

used eleven of thirteen peremptory challenges against otherwise qualified African American members of the venire. Seven African Americans were seated on the jury, one of whom was later removed for cause during the trial. Allen's fate was finally decided by a jury of six African Americans and six Caucasians.

At sentencing, the jury was instructed, in part, that they should "unanimously" find from the evidence whether one or more mitigating circumstances were present. The jury unanimously found the existence of three mitigating circumstances, but concluded that these mitigating circumstances were insufficient to outweigh the aggravating circumstances, and therefore recommended the imposition of a death sentence. After reading the verdict, the court polled each juror. The court re-read the jury instructions requiring unanimity, and subsequently asked each juror if the jury's answers were "still your answers" and if each juror "still assent[ed] thereto." The jurors affirmed their recommendation of the death sentence, which the court imposed.

Allen appealed his conviction to the Supreme Court of North Carolina, which found no error in either the guilt or sentencing phases of Allen's trial. Allen subsequently appealed that decision to the Supreme Court of the United States, which vacated Allen's death sentence and remanded the case for consideration in light of *McKoy v. North Carolina*, 494 U.S. 433 (1990) (holding that North Carolina's capital murder jury instruction requiring unanimity in finding mitigating circumstances was unconstitutional). On remand, the North Carolina Supreme Court found that the *McKoy* error was harmless beyond a reasonable doubt and reinstated the sentence. Primarily contending that the *McKoy* error should not be subject to harmless error analysis, Allen again appealed to the Supreme Court of the United States, which denied certiorari.

Allen then filed a habeas petition and a motion under Fed. R. Civ. P. 59(e) in the United States District Court for the Eastern District of North Carolina. The district court granted summary judgment for the government on Allen's petition for writ of habeas corpus, denied the Rule 59(e) motion, and granted a certificate of appealability on six claims. Allen now appeals three of the claims for which a certificate was granted and one claim for which certification was denied.

## II

We review a district court's decision to grant or deny habeas relief *de novo. Booth-El v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002); *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999). On a claim for which the district court has not already granted a certificate of appealability, we must first determine whether "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). To make such a showing, Allen must demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack*, 529 U.S. at 484 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), once a certificate of appealability has issued, we may only grant habeas corpus relief if we find that the state court's decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Frye v. Lee*, 235 F.3d 897, 903 (4th Cir. 2000) (citing *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000)). Interpreting the "unreasonable application" clause, the Supreme Court has made clear that a federal court may "'grant the writ if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 123 S. Ct. 2527, 2534-35 (2003) (quoting *Williams v. Taylor*, 529 U.S. at 413). That is, "a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Id.* at 2535 (quoting *Lockyer v. Andrade*, 123 S. Ct. 1166, 1175 (2003)).

## III

In this appeal, Allen first asserts that the short-form indictment failed to allege each element of the crime of first-degree murder and any aggravating circumstance supporting the death sentence. He contends that these defects render his first-degree murder conviction and death sentence invalid under *Jones v. United States*, 526 U.S. 227 (1999), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The district

court denied Allen a certificate of appealability on this issue. As noted above, our first inquiry in reviewing this denial entails determining whether Allen "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c); *Slack*, 529 U.S. at 483.

A short-form indictment alleging elements of common law murder is sufficient to inform the defendant of the charge against him, and thus satisfies the requirements of the Sixth Amendment and the Due Process Clause. *See, e.g.*, *Hartman v. Lee*, 283 F.3d 190, 192 (4th Cir. 2002) (considering a challenge to a short-form indictment that is materially indistinguishable from that used in Allen's case). Because the short-form indictment does not raise a substantial constitutional question upon which reasonable jurists could disagree, we deny a certificate of appealability and dismiss this claim.

IV

Next, Allen asserts that the prosecution violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by concealing jail records indicating that he was given substantial daily doses of anti-withdrawal medication during the week following the crime.* Because the district court has issued a certificate of appealability, we proceed directly to the merits of Allen's claim.

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punish-

---

*Allen also argues that the state violated his rights under *Napue v. Illinois*, 360 U.S. 264 (1959), when the prosecutor failed to correct the testimony of Dr. William Brown, who testified that Allen was never given any anti-withdrawal medication. The North Carolina court found this claim procedurally barred because it was not raised in Allen's first Motion for Appropriate Relief. We find this claim procedurally defaulted because Allen failed to make a showing of cause and prejudice or actual innocence to establish a fundamental miscarriage of justice. *See Sawyer v. Whitley*, 505 U.S. 333, 338-39 (1992). Furthermore, even if the claim was not procedurally defaulted, Allen's assertion would still fail because Dr. Brown only testified that *he* had not given Allen any medication, not that Allen *never* received any medication.

ment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "[M]ateriality under *Brady* means that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Fullwood v. Lee*, 290 F.3d 663, 687 (4th Cir. 2002) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In Allen's case, the jail records are not material to a *Brady* challenge because Allen testified at trial that he was neither under the influence of illegal drugs nor experiencing withdrawal at the time of the murder. Thus, even if Allen had received anti-withdrawal medication, his own testimony nullifies what, if any, probative value the jail records would have as to guilt or punishment. Moreover, even if the records were material, Allen would not be entitled to relief under *Brady* if "the information sought is otherwise reasonably available." *Barnes v. Thompson*, 58 F.3d 971, 976 (4th Cir. 1995). That is, "'where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine.'" *Id.* at 975 (quoting *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990)). Because Allen had personal knowledge of any medications he might have received, his *Brady* claim is without merit. We therefore affirm the ruling of the district court.

NIEMEYER, Circuit Judge, writing for the court in this Part V:

## V

Allen also contends that the State's use of peremptory challenges during jury selection was tainted with racial bias, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and that he is entitled to have his conviction and sentence vacated unless the State proffers race-neutral explanations for its conduct during jury selection almost twenty years ago. Allen is an African-American, and Trooper Worley, whom he was convicted of murdering, was white.

During jury selection, 65 venirepersons were called for consideration as potential jurors, of which 24 were African-Americans. The State exercised 13 peremptory challenges in selecting the trial jury panel and two alternates, leaving unused three challenges available to

it. During the process, the State accepted 7 African-Americans and exercised peremptory challenges against 11 African-Americans. The jury as empaneled consisted of seven African-Americans and five whites, and the two alternates were white. Later during the trial when one of the African-Americans on the jury was excused, the court replaced her with the first alternate so that the case was ultimately decided by a jury of six African-Americans and six whites.

The record of the trial indicates that the jury-selection process was careful, deliberate and rational, and all of the questioning by the attorneys and the rulings by the court focused on the appropriate criteria for picking a fair and impartial jury. The process began by seating 12 venirepersons in the jury box on November 4, 1985, and having the lawyers question those jurors as a group and individually. The original panel, selected at random, consisted of five African-Americans and seven whites. As each juror was excused either for cause or as the result of a peremptory challenge, another venireperson was placed in that juror's seat. For the next six to seven court days, the jurors were questioned, replaced, and new jurors questioned. At the end of the process, the jury panel consisted of seven African-Americans and five whites. There is no evidence in the approximately 1,000 pages of transcript covering jury selection that suggests any race-based questions, motives, or conduct. And no suggestion was made by either party during or after jury selection that the other was striking jurors based on race. At the end of jury selection, the court repeatedly asked counsel if the process was appropriate and whether there were any problems: "Before we impanel the jury I wanted to make certain after conferring with all lawyers that there was nothing that needed to be brought to my attention or if there was any problem that existed." Counsel for Allen stated, "We know of nothing, Your Honor, except I would say this . . . ," and counsel then raised an objection about the prosecution's placement of evidence on the table. After that was addressed, the court again asked counsel, "Is there anything that needs to go on the record before the jury is impaneled for the defense?" Counsel for the defense responded, "No, Your Honor."

Allen made no objection during the entire week-long jury selection process that the State discriminated against African-Americans in exercising peremptory challenges, and he evidently saw no reason to undertake to make out a *prima facie* showing of discrimination that

would have permitted the State "to come forward with a neutral explanation for challenging black jurors" and the court to remedy any problem. *Batson*, 476 U.S. at 97. Even though the *Batson* case had not yet been decided by the Supreme Court, it was pending in that Court, and the State asserts that the parties were aware of that fact.

For the first time on direct appeal, however, Allen contended that the State's exercise of peremptory challenges against nine of eleven African-American jurors denied him equal protection. Noting an absence of any explanation in the record for the State's use of its peremptory challenges, Allen made a statistical argument to the North Carolina Supreme Court as follows:

> In this case, 65 prospective jurors were examined, including the examination of alternates: 37 whites, 24 blacks, 1 Indian, and three whose race is unknown. Of these, 14 were selected and 51 were excused: 22 by the Court for cause; 16 by the defendant peremptorily; and 13 by the prosecution peremptorily. Of the 13 jurors excused by the State, all but two were black. The final panel consisted of seven black and five white jurors, with two white alternates. During trial, the trial court removed the black juror in seat number 10 (Mrs. Johnson) and replaced her with the first alternate.

Allen asserted that these statistics and the voir dire of the jury created a *prima facie* case, but he pointed to no evidence from the voir dire to support this assertion.

The State argued to the North Carolina Supreme Court that Allen knew of the *Batson* argument during trial and did not make any objection. The State claimed that by raising the issue two years later for the first time on appeal, Allen was "sandbagging" the State, depriving it of the fresh recollections of its jury selection strategy that would have accompanied a contemporaneous objection by Allen:

> The defendant contends that he is entitled to raise this issue on appeal even though he failed to object at trial. If there ever was a case of "sandbagging," this is it. If you do not object to the peremptory excusing of jurors until two years later, then only the cold record is available for the use of the

> peremptory challenges. The District Attorney has no oppor-
> tunity to explain why he did not like any of the jurors he
> excused. The District Attorney probably does not keep notes
> of why he excused particular jurors, so if a hearing was
> held, he would have no knowledge of a particular juror since
> he has tried hundreds of cases since that time.

Additionally, the State argued that the statistics did not make out a *prima facie* case. It pointed out that "[o]f the 15 black veniremen tendered to the State, it accepted 7, or 47%"; that the jury as selected consisted of 58% African-Americans; and that at that time the population of Halifax County, from which the jury was drawn, was 48% African-American. The State also made an effort to reconstruct the reasons for its exercise of the peremptory challenges against African-Americans, noting that one important consideration given was whether any potential juror had a son because such a juror would empathize with Allen and his mother. The record of voir dire supports the State's assertion. The State further claimed that almost all of the African-Americans stricken "met the same pattern." Thus, with respect to juror Jacqueline Davis, who the dissenters have suggested was stricken because of race, the State pointed out to the North Carolina Supreme Court that Davis had a son. Tr. at 353. Davis also knew one of the defense attorneys, who was a customer at the Davis store and to whom she referred as "Steve."

The North Carolina Supreme Court rejected the *Batson* challenge based on the facts that (1) "the State accepted seven of the seventeen black veniremen tendered" and (2) "the majority of the jury which tried the defendant was black." *State v. Allen*, 372 S.E.2d 855, 862 (N.C. 1988). The court concluded that in the circumstances where the State "accepted seven or forty-one percent" of the African-American members of the venire, an "inference" of racial motivation did not arise, and the defendant failed to make a *prima facie* case that the State's peremptory challenges were racially motivated. *Id*. Allen did not appeal this ruling to the United States Supreme Court in his petition for a writ of certiorari.

In his petition for a writ of habeas corpus filed in this case, Allen again raised the *Batson* issue, proffering only statistical evidence. After examining the record and the North Carolina Supreme Court's

disposition of the *Batson* claim based on the record, the district court concluded:

> Examining this claim based upon the clearly established federal law existing in 1988, this court finds that the North Carolina Supreme Court's adjudication of this claim is neither contrary to nor an unreasonable application of *Batson*. *Batson* did not establish a mathematical formula to be applied but rather instructed that the trial courts were to consider "all relevant circumstances" surrounding the jury selection process. [Citation omitted]. Allen has failed to establish that the North Carolina Supreme Court's adjudication of this claim was contrary to, or involved an unreasonable application of, *Batson*.

On this record, we affirm. First, we conclude that Allen did not adequately preserve his *Batson* objection. In July 1985, Allen filed a motion to increase the number of peremptory challenges available to him on five grounds, one of which was that the prosecutor had in the past assertedly exhibited a "propensity toward excluding blacks from trial juries by use of his peremptory challenges." Just prior to the beginning of jury selection on November 4, 1985, the trial court denied Allen's motion. After the jury selection process resulted in a jury that was 58% African-American, Allen did not renew his anticipatory *Batson* objection. Were these the only facts before us, Allen's case would be meaningfully indistinguishable from *Ford v. Georgia*, 498 U.S. 411 (1991), where the Supreme Court held that a pretrial motion relating to the State's use of peremptory challenges was sufficient to raise a *Batson* objection. In this case, however, the trial judge began jury selection by denying Allen's motion that was based, in part, on concern for the prosecutor's anticipated use of peremptory challenges and concluded jury selection by twice inviting Allen to voice any concerns with the *actual* jury selection process. The judge stated, "Before we impanel the jury I wanted to make certain after conferring with all lawyers that there was nothing that needed to be brought to my attention or if there was any problem that existed." After Allen's counsel voiced an objection to the courtroom placement of certain evidence, the judge again asked, "Is there anything that needs to go on the record before the jury is impaneled for the defense?" Allen's counsel responded, "No, Your Honor." Thus, even

though Allen's July 1985 motion might otherwise have been sufficient to raise a *Batson* objection under the holding of *Ford*, Allen's silence after the trial judge's repeated calls for objections after the actual jury selection amounted to an abandonment of his anticipatory *Batson* objection. It would be an odd result to allow a defendant who twice rejected a trial judge's explicit invitation to object contemporaneously to the jury selection process to exploit the faded memory of the prosecutors by raising such an objection years later.

In reaching this conclusion, it is important to clarify that Allen's *Batson* claim was not procedurally defaulted under any North Carolina or federal law. Rather, he is denied any remedy on this claim because he expressly relinquished his right to a remedy at trial by, in effect, consenting to be tried by the jury as constituted. He cannot rescind that consent now.

But even if Allen had preserved his objection, the burden of establishing a *prima facie* case under *Batson* falls on the defendant, *see Batson*, 476 U.S. at 96-97, and based on the record in this case, we conclude that Allen never carried that burden. We therefore agree with the district court's conclusion that the North Carolina Supreme Court's decision to reject Allen's *Batson* claim raised for the first time on appeal was not an "unreasonable application" of *Batson*. *See* 28 U.S.C. § 2254(d)(1).

Of course, the standard that Allen must now meet is not whether the North Carolina Supreme Court was right. That issue was available to him on direct review to the Supreme Court. The standard on collateral review of a State decision challenged through federal habeas corpus requires that the federal court deny the writ unless the State's adjudication of the particular issue "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In determining whether an application of Federal law is unreasonable, the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 410-11 (2000), stated:

> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Congress specifically used the word "unreasonable," and not a term

like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

In *Batson*, the Supreme Court articulated the "evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury." 476 U.S. at 82. To carry his burden, a defendant must show (1) that "he is a member of a cognizable racial group"; (2) that the "prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race"; and (3) that "these facts and any other relevant circumstances raise an inference that the prosecutor used [the peremptory challenges] to exclude the veniremen from the petit jury on account of their race." *Id.* at 96; *see also Keel v. French*, 162 F.3d 263, 271 (4th Cir. 1998), *cert. denied*, 527 U.S. 1011 (1999). *Only after the defendant* makes a showing sufficient to raise an "inference of purposeful discrimination" is the State required "to come forward with a neutral explanation for challenging black jurors." *Batson*, 476 U.S. at 96-97.

In this case, the *only* facts that Allen identified to support an inference of purposeful discrimination were raw statistics about the racial make-up of the venire and those excluded from the jury through peremptory challenges. He has presented no other circumstantial facts that "raise an inference" that the State was discriminating against African-Americans in exercising its peremptory challenges. Indeed, the State has pointed out that its voir dire of the venire was the same for African-Americans as it was for whites, and it points out that the circumstances revealed by answers to its voir dire as to each juror justified its exercise of peremptory challenges on racially neutral grounds.

Moreover, the only "pattern" that we can discern from the raw statistics that Allen has produced suggests that the State did *not* exercise its peremptory challenges on the basis of race. We know, for instance,

that with respect to Seat 1, Seat 4, and Seat 8, on which the State exercised a majority of its peremptory challenges to African-Americans, the State ultimately accepted an African-American to sit on the jury in each of those seats. Indeed, with respect to Seat 10, after the State exercised a peremptory challenge against a white and after Allen exercised peremptory challenges against two whites, the State accepted the first African-American slotted for that seat. When the first person seated in Seat 7 was an African-American, the State accepted the juror. On Seat 2, after a white was challenged for cause, the State accepted the replacement African-American. On Seat 6, when the State exercised a peremptory challenge against a white, an African-American replaced the white and the State accepted the juror. In accepting these African-American jurors, the State left unused peremptory challenges that were available to it. Only on Seat 3 did the State's exercise of a peremptory challenge result in the race of a juror changing from African-American to white. We conclude that this "pattern" supports an inference that discrimination against African-Americans was not a reason for the State's exercise of peremptory challenges. Concluding that the State was using peremptory challenges to fashion a jury with fewer African-Americans on it necessarily ascribes the highest degree of ineptitude to the State, for its efforts resulted in a jury being empaneled that had more African-Americans on it than if it had exercised no challenges at all. In the absence of any other circumstantial evidence, we cannot conclude that Allen carried his burden of making a *prima facie* showing. More relevant to the inquiry now, Allen has failed to establish that the North Carolina Supreme Court's application of *Batson* on this record was an unreasonable one. Therefore, we conclude that the district court correctly rejected Allen's *Batson* challenge.

The dissenting opinion faults the North Carolina Supreme Court for considering the statistical make-up of the impaneled jury in determining whether a *Batson* violation occurred and for failing to consider any of Allen's evidence of discrimination. *Post* at 61-62. It asserts that the North Carolina Supreme Court "should have focused on those members of the venire who were *excluded* from the jury." *Id*. at 62. It then reiterates Allen's statistical argument and concludes that "Allen's evidence of discrimination is compelling." *Id*. To support this conclusion, the dissenters recite Allen's evidence in its entirety:

> Out of 66 prospective jurors on the venire, 38 (57.5%) were Caucasian, 24 (36.3%) were African American, and 4 (6%) were of another race. (J.A. at 57.) The prosecution used 84.6% of its peremptory challenges to exclude African Americans from the jury, even though African Americans only represented 36.3% of the venire presented.

*Id.*

The use of these raw statistics, however, is both selective and uninformative. For example, the statistics as used do not account for the fact that the State exercised its peremptory challenges in a selective manner that reshaped the original panel seated, which had five African-Americans, into a jury of seven African-Americans. As already noted, most of the State's peremptory challenges were exercised on the selection of jurors to fill three seats, and the State ultimately accepted an African-American in each of those seats. We suggest that selective statistics just as well demonstrate the opposite inference. For example, the percentage of African-Americans accepted by the State and seated on the jury — 58% (7 of 12) — exceeded the percentage of African-Americans on the venire — 37% (24 of 65) — and exceeded the percentage of African-Americans in the county — 48%.

Though statistics are not utterly bereft of analytical value, they are, at best, manipulable and untrustworthy absent a holistic view of the circumstances to which they apply. The statistics relied upon by Allen, and upon which the dissenters command a "focus," do not tell the whole story or even an accurate story in this case. As we have already described in greater detail, the majority of the State's peremptory challenges against African-American venirepersons were exercised with respect to seats for which the State ultimately accepted an African-American juror. And there was only one seat on which the race changed from African-American to white as a result of the State's peremptory challenge. The end result was that from a venire consisting of 37% African-Americans, the State accepted a jury of 58% African-Americans.

Perhaps out of concern that the statistical evidence proves nothing, the dissenting opinion engages in its own factfinding, comparing the

circumstances of venireperson Jacqueline Davis, an African-American, with those of venireperson Mildred Thorne, who was white. Davis was peremptorily stricken by the State and Thorne was not. The dissent concludes that because both Davis and Thorne knew defense counsel and both seemed to respond similarly to questions about the death penalty, there was nothing to justify the State's treating them differently for purposes of exercising peremptory challenges. This comparison led the dissenters to conclude that the "decision to keep Juror Thorne is particularly suspect when compared to the prosecutor's decision to strike Juror Davis." *Post* at 62 n.3. The dissenting opinion then dresses up this "suspicion" into a factual "finding that the prosecution struck some jurors on the basis of race." *Id.*

As a preliminary matter, we note that the comparison of these two particular jurors was not urged by the litigants but was initiated by the dissenters on the cold record. In fact, the dissenting opinion's comparison derogates from Allen's strenuous argument in his reply brief that "this Court cannot evaluate" the State's reasons for dismissing jurors "on a cold record," and that any attempt to do so would be "speculation." Indeed, an examination of the comparison suggests that only speculation supports the dissenting opinion's conclusions. First, it must be recognized that the State's reasons for exercising peremptory challenges were never elicited on the record because no objection was ever made. The dissenting opinion never acknowledges the possibility of race-neutral factors on which the State could have legitimately relied. But even based on the record, it fails to acknowledge the State's reconstruction of its reasons on its direct appeal to the North Carolina Supreme Court. In its explanation to that court, the State observed that juror Davis had a son, *see* Tr. at 353, making her a person who might be empathetic to Allen and his mother. The State pointed out that this mother-son relationship was an important consideration that formed its decisions to exercise peremptory challenges. Although Juror Thorne had a daughter, she did not have a son. Finally, the dissenting opinion does not consider the fact that even though the State exercised a peremptory challenge to strike Davis, it ultimately accepted an African-American as the juror in her seat.

The dissenting opinion's comparison of two jurors, totally out of context and without the data necessary to make an informed compari-

son, amounts only to speculation and implicitly confirms that, without the aid of such speculation, Allen has not otherwise presented evidence sufficient to raise an inference of race-based discrimination. Without any evidence of improper statements or questions, the statistical evidence considered more fully can hardly be found to evidence a pattern of the State exercising peremptory challenges to eliminate African-Americans from the jury.

In sum, while we need not resolve whether the North Carolina Supreme Court "got it right" in concluding that Allen failed to make a *prima facie* showing, there can be little doubt that its application of the *Batson* principles cannot be found to be an unreasonable one on this record. We therefore affirm the district court's dismissal of Allen's *Batson* claim.

WILKINS, Chief Judge, concurring:

I concur in Parts I through V of the opinion written by Judge Niemeyer and Judge Gregory. I also concur in Judge Gregory's plurality opinion stating that Allen is entitled to habeas relief based on the unconstitutional unanimity instruction given to the jury at his sentencing hearing. I write separately to add an additional comment regarding the prejudicial effect of this instruction.

As described in Judge Gregory's plurality opinion, the jury—operating under the constraints of this improper instruction—accepted three of the mitigating circumstances submitted to it (because all 12 jurors agreed) but rejected seven others (because at least one juror did not agree). One of the mitigating circumstances that the jury did not unanimously accept was the statutory "catch-all," which allows the jury to consider any "circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value," *id.* at 101; *see* N.C. Gen. Stat. § 15A-2000(f)(9) (2003). This catch-all mitigator permits jurors to consider, *inter alia*, whether the evidence supports imposition of a life sentence on grounds of mercy. *See State v. Hill*, 417 S.E.2d 765, 782-83 (N.C. 1992) (noting that jurors in North Carolina are not precluded from giving effect to feelings of sympathy arising from the defendant's mitigating evidence).

The evidence here showed that Allen had a close relationship with some members of his family, including the eldest of his three sons.

A reasonable juror could have concluded that Allen should be spared from the death penalty so that his children would not lose their father. Under the unconstitutional unanimity instruction given at Allen's sentencing hearing, however, that juror would have been precluded from voting for a life sentence based on these sincere feelings of mercy. Indeed, even if *eleven* jurors had decided that mercy should be shown, they would not have been able to do so as long as the remaining member of the jury disagreed.

I recognize that the record includes evidence that might have offset any sympathy the jury felt for Allen and his family, including evidence that Allen's victim had a wife and two children of his own. On the other hand, given the broad discretion that jurors have when voting for a life or death sentence, at least one juror could have concluded that taking a father from Allen's children would only compound the great tragedy inflicted on Trooper Worley's children. *Cf.* N.C. Gen. Stat. § 15A-2000(b) (2003) (requiring the imposition of a life sentence when a capital sentencing jury is unable to reach a unanimous decision within a reasonable time).

It is not for us to decide which of these views is more sound, nor do I suggest that I would have concluded that a life sentence was appropriate. Our role is only to assess the likelihood that, in the absence of the unconstitutional instruction, at least one juror would have found as a mitigating factor that Allen deserved mercy and would have concluded that this factor, combined with others supported by the evidence, outweighed the aggravating circumstances established by the prosecution.* Based on my experiences as a trial

---

*The jury found two aggravating factors: that Allen committed murder "for the purpose of avoiding a lawful arrest," and that "this murder [was] committed against a law enforcement officer while engaged in the performance of his official duties." J.A. 99-100. Although the murder was unquestionably brutal, the jury was not asked to find any aggravating circumstance based on the nature of the killing. *Cf., e.g.*, N.C. Gen. Stat. § 15A-2000(e)(9) (2003) (establishing as an aggravator that the crime of conviction was "especially heinous, atrocious, or cruel"). Thus, in assigning weight to the aggravating factors it had found, the jury was not permitted to consider the brutality of the murder for which Allen was convicted. We must bear this restriction in mind in assessing the likelihood that, but for the unconstitutional unanimity instruction, at least one juror would have voted for a life sentence.

judge and prosecuting attorney, I conclude that this possibility is sufficiently great that I remain in grave doubt about whether the error was harmless. *See O'Neal v. McAninch*, 513 U.S. 432, 434 (1995). I therefore vote to remand this case to the district court with instructions to issue a conditional writ of habeas corpus.

Judge Motz has requested that she be shown as joining in this opinion.

TRAXLER, Circuit Judge, concurring in part and concurring in the judgment:

I concur in Parts I through IV of the opinion authored by Judge Gregory and Part V of the opinion authored by Judge Niemeyer. I also concur in the judgment on the *McKoy* issue. Because I have come to view the *McKoy* issue somewhat differently from my colleagues, however, I write separately to express my views regarding how *McKoy*, *Chapman*, and *Brecht* intersect in the circumstances of this case.

I.

In the early morning hours of May 14, 1985, North Carolina Highway Patrolman Raymond Worley radioed his dispatcher that he was stopping two vans with Maryland license tags. After receiving no further communication, the dispatcher sent officers to search for Worley. Worley's patrol car was found on the side of the road, parked behind a white van. The driver's side window of the car was shattered and Worley was sitting in the driver's seat, his body leaning to the right with his head tilted downward. Blood covered his shirt and was spattered on his right arm, right leg and across the right side of his head. He was pronounced dead at the scene. A .22 caliber pistol and an identification card for Antonio Worrell were found at the scene. According to the autopsy, Worley had been shot three times with a .38 caliber firearm. One bullet entered behind his right ear, traveled through his neck, and lodged in his left back. Another bullet entered his right shoulder and lodged near the right base of his neck. A third bullet hit the middle finger of his left hand. The medical examiner testified that "Worley's lungs were hyperinflated due to blood rushing into the airways, essentially drowning him in his own blood." *State*

*v. Allen*, 372 S.E.2d 855, 858 (N.C. 1988). It was estimated that Worley lost consciousness within a minute and died within three to four minutes of the shooting. Within a matter of hours, officers had located Allen's brother, Alex, walking near where a black van had been abandoned, in possession of a .38 caliber firearm, and tracked three other men, including Allen, to a nearby area where they were hiding in bushes.

Later that afternoon, Allen confessed to the murder. According to Allen, he, Alex, Worrell and Mack Greene left Washington, D.C. on May 11 in a stolen black van. They traveled to North Carolina, where they broke into a store and stole beer, cigarettes and the .22 and .38 caliber pistols. Allen kept the .38 pistol and gave the .22 pistol to Worrell. The men then stole a white van from a car lot. Allen and Alex got into the white van and followed Worrell and Greene in the black van, intending to return to Washington. While en route, Worley pulled over the two vans. After Worley approached and spoke to Worrell, the two men walked to the patrol car. Worley then motioned for Allen to come to the patrol car. According to Allen's written confession, Worley reached over to unlock the passenger door as Allen approached and Allen began shooting. The men then fled the scene in the black van. At the murder trial, however, Allen denied shooting Worley. Allen testified that he, Worrell, and Worley had met at the patrol car, but that he had returned to the black van to get his license when he heard shots being fired.

After the jury convicted Allen of the first-degree murder charge and stolen property charges, a capital sentencing hearing was held pursuant to N.C. Gen. Stat. § 15A-2000. At the conclusion of the hearing, the trial court submitted two aggravating and ten mitigating circumstances for consideration by the jury. *See* N.C. Gen. Stat. § 15A-2000(b). However, the jury was instructed that it must *unanimously* find the existence of any mitigating circumstances before such circumstances could be weighed against any aggravating circumstance. *See* N.C. Gen. Stat. § 15A-2000(b)(2). The jury found the existence of both aggravators, but only three of the ten mitigators, and returned a sentence of death.

At the time Allen was sentenced, the North Carolina Supreme Court had upheld this requirement of unanimity for mitigating cir-

cumstances. *See State v. Kirkley*, 302 S.E.2d 144, 157 (N.C. 1983). During the pendency of his direct appeal, however, the United States Supreme Court overruled *Kirkley* and struck down the unanimity requirement because it "violated the principle in *Lockett v. Ohio*, 438 U.S. 586 (1978), that a sentencer may not be precluded from giving effect to all mitigating evidence." *McKoy v. North Carolina*, 494 U.S. 433, 438 (1990) (quoting *Mills v. Maryland*, 486 U.S. 367, 375 (1988)). "Relevant mitigating evidence," the Court held, "is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Id.* at 440 (internal quotation marks omitted). Two weeks after the Supreme Court's decision in *McKoy* was handed down, the Supreme Court granted Allen's petition for writ of certiorari and remanded his case to the North Carolina Supreme Court for further consideration in light of *McKoy*. *See Allen v. North Carolina*, 494 U.S. 1021 (1990).

On remand, the state conceded *McKoy* error in the charge in Allen's case, but argued that the error was "harmless beyond a reasonable doubt" based upon the post-sentencing jury poll, and the North Carolina Supreme Court agreed. *See State v. Allen*, 417 S.E.2d 227, 228 (1992). The United States Supreme Court denied certiorari, with three justices voting to grant the petition for writ of certiorari and reverse the judgment. *See Allen v. North Carolina*, 507 U.S. 967 (1993). Allen's subsequent motion for appropriate relief, *see* N.C. Gen. Stat. § 15A-1415, was denied by the state court, and this § 2254 petition followed.

When *McKoy* was decided by the Supreme Court, the North Carolina court, faced with the task of dealing with a number of death sentences imposed under the erroneous instruction, was initially presented with the question of whether the error was susceptible to harmless error analysis. Although ultimately concluding that "*McKoy* errors are subject to harmless error analysis," the court recognized that "it would be a rare case in which a *McKoy* error could be deemed harmless." *State v. McKoy*, 394 S.E.2d 426, 433 (N.C. 1990). And since that time, the North Carolina Supreme Court has consistently decided that, where the evidence supports at least one unfound mitigating circumstance, the court cannot conclude beyond a reasonable doubt that the erroneous instruction did not prevent one or more jurors from finding the mitigating circumstance to exist. *See State v.*

*Zuniga*, 444 S.E.2d 443, 447 (N.C. 1994) (noting that the North Carolina court "has refused to hold *McKoy* error harmless where [the Court has] found 'credible evidence supporting at least one submitted, but unfound mitigating circumstance'" (quoting *State v. Robinson*, 409 S.E.2d 288, 307 (N.C. 1991))). In addition, the court has *refused* to evaluate the harmlessness of a *McKoy* error by reweighing aggravating and mitigating evidence:

> This Court, in the *McKoy* error cases, has not inquired as to how individual jurors might have balanced the aggravating and mitigating evidence to resolve the harmlessness issue. On this issue, *our only inquiry has been whether the evidence is such that one or more jurors could reasonably have found a statutory mitigating circumstance to exist.* Where we have concluded there is such evidence, unless there is in the record something, such as a [post-verdict] poll, by which we can determine that the mitigating circumstance was unanimously rejected, we have consistently held *McKoy* error to be not harmless and the defendant entitled to a new capital sentencing proceeding. *We have not thought it our function, in resolving the harmlessness issue, to surmise how one or more jurors might weigh the aggravating and mitigating evidence, which is capsulized in the form of individually submitted "circumstances." This function, we continue to believe, is solely for the trial jurors who hear the evidence and are properly instructed on the law.*

*State v. Lloyd*, 407 S.E.2d 218, 221-22 (N.C. 1991) ("*Lloyd II*") (internal citations omitted) (emphasis added).[1]

---

[1]In *Lloyd II*, the court, having rejected the state's contention that the jury poll revealed unanimous rejection of the unfound mitigating circumstances, concluded that the unanimity instruction was not otherwise harmless error because the evidence supported the trial court's submission of the "no significant history of prior criminal activity" mitigator to the jury. *See Lloyd II* at 222 (internal quotation marks omitted); *see also State v. Lloyd*, 364 S.E.2d 316, 323-24 (N.C. 1988) ("*Lloyd* I") (upholding trial court's submission of the "no significant history" mitigator despite the fact that defendant had been convicted of two prior felony and numerous misdemeanor convictions several years prior to the murder).

In the more than thirty capital cases to reach the North Carolina Supreme Court since *McKoy*, the court has found the unanimity instruction to have been a harmless error in a total of five cases (including *Allen*). In two cases, the court found (as it did in *Allen*) that the specific questions asked of the individual jurors during the polling revealed that the jurors had unanimously rejected the unfound submitted circumstances. *See State v. Price*, 418 S.E.2d 169, 173 (N.C. 1992), *vacated on other grounds by Price v. North Carolina*, 506 U.S. 1043 (1993); *State v. Laws*, 402 S.E.2d 573, 575-77 (N.C. 1991). In one case, the court found that the error was harmless because the jury actually *found* the existence of *all* proposed mitigating circumstances submitted, but nonetheless imposed the death penalty. *See State v. Roper*, 402 S.E.2d 600, 619 (N.C. 1991). And, in the single remaining case, the court found the error harmless because the defendant presented *no* mitigating evidence during the sentencing phase of his trial and the only mitigating circumstance submitted was the "catch-all" circumstance which, by definition, must arise "from the evidence" submitted. *See State v. Hunt*, 411 S.E.2d 806, 814 (N.C. 1992).

## II.

It is against the backdrop of this pertinent North Carolina law that I can now review the *McKoy* error under 28 U.S.C.A. § 2254(d) (West 1994 & Supp. 2003) and under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

## A.

The *McKoy* error is undisputed. Thus, the initial question before us is the same as that before the North Carolina Supreme Court: Was the *McKoy* error harmless beyond a reasonable doubt? *See Chapman v. California*, 386 U.S. 18, 24 (1967).[2] But, because that question was adjudicated on the merits by the state court, we may only review that adjudication under the deferential provisions of § 2254(d). We may

---

[2]Although the state court did not cite to the *Chapman* harmlessness standard, *see Chapman*, 386 U.S. at 24 (providing that error is harmless where it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"), the North Carolina standard applied under its statutes is the same as the *Chapman* standard.

grant federal habeas relief only if North Carolina's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.*; *see also Williams v. Taylor*, 529 U.S. 362, 376 (2000).

The North Carolina court concluded that the *McKoy* error was "harmless beyond a reasonable doubt" based upon its determination that the post-verdict poll demonstrated that the individual jurors were unanimous in their rejection of the seven unfound mitigating factors submitted to it by the trial judge. *See Allen*, 417 S.E.2d at 228. Like my colleagues, I find this construction of the jury poll to be an unreasonable application of the *Chapman* standard and, therefore, that § 2254 does not *preclude* us from granting habeas relief to Allen in this case.

## B.

With no barrier to the grant of habeas relief presented by § 2254(d), I turn to the next distinct step in our analysis. A determination that the state court's adjudication was the product of an unreasonable application of *Chapman* only results in our conducting an independent review of the harmlessness of the *McKoy* error, as opposed to conducting further review under the deferential standards set forth in the AEDPA amendments to § 2254(d). And, because we are dealing with a constitutional error subject to harmless error review in a habeas proceeding, we are to review the claim not under the *Chapman* harmless-error standard, but under the harmless-error standard of review set forth by the Supreme Court in *Brecht*.

In recognition of the strong principles of comity and respect for state court judgments, *Brecht* directs that we not grant habeas relief to a defendant unless "'[the error] had a substantial and injurious effect or influence on the jury's verdict,'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946), or we are "in 'grave doubt' as to the harmlessness of [the] error." *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995)); *see also Boyd v. French*, 147 F.3d 319, 327 (4th Cir. 1998); *Cooper v. Taylor*, 103 F.3d 366, 370 (4th Cir. 1996) (en banc). We "do[ ] not ask whether the evidence of

guilt was sufficient, whether the jury would have reached the same conclusion if the error had not occurred, or whether the jury reached the correct result based on the evidence presented." *Boyd*, 147 F.3d at 327.

> In order for an error to have a substantial and injurious effect or influence, it must have affected the verdict. Because juries have a limited number of responses to give in a criminal trial—guilty, innocent, or cannot decide—an error is harmless when the error did not substantially sway or substantially influence the response.

> Thus, if the evidence is not merely sufficient, but so powerful, overwhelming, or cumulative that the error simply could not reasonably be said to have substantially swayed the jury's judgment, then the error is not harmful. On the other hand, if the federal court is in grave doubt about whether the trial error had a substantial and injurious effect or influence on the verdict and therefore finds itself in virtual equipoise about the issue, the error is not harmless.

*Cooper*, 103 F.3d at 370 (citations and internal quotation marks omitted). Also, the inquiry is no longer one of *who* bears the burden of establishing harmlessness or error. Rather, it is "conceptually clearer for the judge to ask directly, 'Do I, the judge, think that the error substantially influenced the jury's decision?' than for the judge to try to put the same question in terms of proof burdens (*e.g.*, 'Do I believe the party has borne its burden of showing. . .?')." *O'Neal*, 513 U.S. at 436-37. "Grave doubt" exists when, in light of the entire record, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 435. "[W]here the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," "the petitioner must win." *Id.* at 436, 437.

Having reviewed the record in this case within the confines of this standard, I am compelled to join the vote to grant conditional habeas relief to Allen.

First, although I cannot say with certainty that the unanimity instruction had a substantial and injurious effect or influence on the

verdict of death, the nature of the error in this case unquestionably leaves me in grave doubt as to whether it was in fact harmless. According to Allen's confession, Allen walked up to the driver's side window and shot Worley as he reached over to open the passenger door to his police car and Allen fled the scene with the others. Officer Worley likely lost consciousness within one minute and died within four minutes. During the sentencing phase of the trial, the state presented no additional facts in support of the two aggravating factors submitted, and we know that the jury *unanimously* found the existence of the only two aggravating circumstances submitted to it for consideration — that Allen shot Patrolman Worley while Worley was engaged in his official duties in order to avoid being arrested for crimes that he committed with his cohorts during their trip from Washington to North Carolina.

Allen, however, presented the testimony of himself, his mother, his girlfriend, and his ex-wife in mitigation. With regard to Allen's background, Allen's mother testified that, from an early age, Allen witnessed frequent arguments between his parents, culminating in his need for medical treatment for nervousness. Allen's mother and father ultimately separated, following a violent argument that occurred at Allen's third birthday party, and Allen was thereafter reared in a single-parent home by his mother and grandmother. From the time his parents separated until Allen was approximately 12 years old, Allen's father financially supported his ex-wife and children, but only saw his children once every three months or so. When Allen was approximately 12 years old and entering the sixth grade, his mother moved the family to Washington, D.C. As a result, Allen was able to see his father more frequently. However, Allen's most significant adolescent problems began at about this same time. Upon arriving in Washington, Allen failed the sixth grade. He started drinking alcohol at age 14 or 15, began using heroin at age 15 or 16, married his pregnant girlfriend and dropped out of high school in the 10th grade, and added Preludin (a form of speed) to his heroin use at about the same time. Allen's mother testified that Allen received a church education and had "plenty," but testified that Allen had successfully hidden his early use of alcohol and drugs from both his father and her.

The second category of mitigating evidence pertained to Allen's status as a father. Allen is the father of three sons. That is uncontro-

verted. As noted above, he married his first wife when he was 17 years old after she became pregnant with his first son, Timothy Jr. They divorced three years later, when Allen was 20 years old, but it appears uncontroverted that Allen maintained a very close and ongoing relationship with Timothy Jr. after the divorce. Allen, his mother and his father also maintained an ongoing relationship with Allen's first wife. Indeed, Allen's first wife and their son Timothy Jr. were present at the sentencing hearing and were pointed out to the jury, and she testified on Allen's behalf. There was also testimony that Allen maintains some contact with his third son, but that he has been unable to locate or have contact with his second son because the mother moved away. There was also evidence that Allen maintained continuous employment while he was not incarcerated, which appears would have been at all times other than when Allen served a one-year sentence and a two-year sentence during his twenties.

As a result of the erroneous "unanimity" instruction given at the conclusion of the sentencing hearing, we know that the jury *unanimously* found three mitigating circumstances: (1) that Allen had no history of the use of a deadly weapon; (2) that Allen expressed remorse for the death of Trooper Worley; and (3) that Allen completed his high school education by obtaining his general equivalency degree while imprisoned. We also know that the jury *did not unanimously find* the existence of the seven additional mitigating circumstances that the trial court submitted for consideration: (1) that Allen had no significant history of prior criminal activity; (2) that Allen's age at the time of the offense (30 years old) was a mitigating factor; (3) that Allen was reared in a single-parent home; (4) that Allen is the father of three sons; (5) that Allen remained employed during the times he was not incarcerated; (6) that Allen was a supporting parent of at least one of his children; or (7) the "catch-all" question of whether any single other circumstance arising from the evidence existed that the jury thought had mitigating value. But, we do *not* know whether any juror or jurors (fewer than twelve) found that any of these seven potentially mitigating circumstances existed or, if they did, whether the juror or jurors would have weighed the additional mitigator or mitigators against the two aggravating circumstances and voted *against* the death penalty had they not been instructed that they *must ignore* them in the final analysis.

Having reviewed the entire record and, in particular the evidence supporting the mitigating circumstances which were not unanimously found by the jury, I cannot conclude with "fair assurance," *O'Neal*, 513 U.S. at 437, that no "juror's sentencing decision would have been substantially influenced" by any of the mitigating factors not unanimously found by the jury, *see Boyd*, 147 F.3d at 328. And because, after reviewing the record and the evidence presented in mitigation and aggravation, I am in "virtual equipoise as to the harmlessness of the [*McKoy*] error," *O'Neal*, 513 U.S. at 434, I am directed by Supreme Court precedent to "treat the error, not as if it were harmless, but as if it affected the verdict (*i.e.*, as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." *Id.*

Second, I note that, while the *Brecht* analysis is not defined by opinions of the North Carolina Supreme Court, I believe habeas relief would be inappropriate under *Brecht* for an additional reason, more unique to this case. *Brecht* recognizes that "federal habeas courts play an important role in protecting the constitutional rights of state criminal defendants," but also reminds us that this "role is circumscribed and *secondary* to that of state courts." *Boyd*, 147 F.3d at 327.

In this case, the North Carolina Supreme Court found the *McKoy* error to be harmless (and thus one of the "rare cases" in which the defendant does not get a new sentencing hearing) because the jury poll revealed that the jury unanimously rejected the unfound mitigating circumstances, a decision which we have now rejected as being a unreasonable application of the *Chapman* harmless error standard. It seems perverse that we then consider denying habeas relief from a North Carolina death sentence imposed under North Carolina's death sentencing scheme because we believe, based upon *our* "reweighing" of the evidence under *Brecht*, that it should be upheld in the face of knowing that the North Carolina Supreme Court *did not* find the *McKoy* error harmless for that reason under the *Chapman* standard and *would not* have performed such a reweighing itself. In short, we would be doing what North Carolina would not do. *Cf. Maynard v. Cartwright*, 486 U.S. 356, 365 (1988) (upholding invalidation of death sentence imposed by Oklahoma jury where one of two aggravating circumstances submitted to the jury was unconstitutional and Oklahoma courts had "'no provision for curing on appeal a sentencer's consideration of an invalid aggravating circumstance'" (quot-

ing *Cartwright v. Maynard*, 822 F.2d 1477, 1482 (10th Cir. 1987))).[3]
Without a post-verdict poll that would legitimately cure the *McKoy*
error, I believe North Carolina's law is unequivocal that Allen would
have received a resentencing hearing. And, this belief is only bol-
stered by the fact that the state of North Carolina did not argue as an
alternative ground for denying habeas relief that the verdict should be
upheld based on a reweighing of the evidence.

In conclusion, although I might have found none of the additional
mitigating factors and voted to render the same verdict as did the
improperly instructed jury, I would respect North Carolina's view that
it is not the court's "function, in resolving the harmlessness issue, to
surmise how one or more jurors might weigh the aggravating and mit-
igating evidence. . . . This function . . . is solely for the trial jurors
who hear the evidence and are properly instructed on the law." *Lloyd*,
407 S.E.2d at 222. And even though we would not be bound by North
Carolina's interpretation of how *Chapman*'s "harmless beyond a rea-
sonable doubt" standard is to apply to a constitutional error reviewed
under *Brecht*, the same principles of comity and respect for the state
courts which underscore *Brecht* would render it improper for us to
uphold North Carolina's death sentence on this basis. In any event,
the evidence submitted in support of the unfound mitigating factors
is not insignificant nor incredible in my view, nor apparently in the
view of the North Carolina trial court which admitted the evidence
*and* submitted the mitigators (some over objection by the state) as
being supported by the evidence. For all these reasons, I am in grave
doubt as to the harmlessness of the trial error (and in no doubt as to
the prejudice Allen would have suffered if this court had denied
habeas relief following a reweighing process).

---

[3]More specifically, in *Cartwright v. Maynard*, 822 F.2d 1477, 1482
(10th Cir. 1987), the Tenth Circuit noted that "[t]he Oklahoma courts
ha[d] refused to apply the harmless error analysis or to independently
reweigh the aggravating and mitigating circumstances. Thus, Oklahoma
ha[d] no provision for curing on appeal a sentencer's consideration of an
invalid aggravating circumstance." On appeal, the Supreme Court noted
that "[if] this was the case at that time, and the State does not dispute it,
the Court of Appeals cannot be faulted for not itself undertaking what the
state courts themselves refused to do." *Maynard v. Cartwright*, 486 U.S.
356, 365 (1988).

### III.

For the foregoing reasons, I agree that the state court's adjudication of Allen's *McKoy* claim was unreasonable and that Allen is entitled to a conditional writ of habeas corpus because I am in grave doubt as to whether the *McKoy* error was harmless under the *Brecht*/*O'Neal* standard. Under such circumstances, I am compelled to join in the decision to grant Allen a conditional writ of habeas corpus and leave it for a properly instructed jury to determine on an individual basis whether the mitigating circumstances of Allen's life outweigh the aggravating circumstances of this unquestionably senseless murder.

Judge Shedd has requested that he be shown as joining in this opinion.

**Volume 2 of 2**

GREGORY, Circuit Judge, concurring in the judgment on the *McKoy* issue:

   During the sentencing phase of Allen's trial, the judge instructed the jury that it must unanimously find the existence of any mitigating circumstance before considering that circumstance in determining whether Allen should be sentenced to life imprisonment or death. This was the same instruction that the Supreme Court found unconstitutional in *McKoy v. North Carolina*, 494 U.S. 433 (1990). In *McKoy*, the Court held this jury instruction unconstitutional because the "unanimity requirement . . . prevent[s] the sentencer from considering all mitigating evidence." 494 U.S. at 435. Thus, on direct review in this case, the Supreme Court vacated Allen's sentence and remanded the

case to the North Carolina Supreme Court in light of *McKoy. Allen v. North Carolina*, 494 U.S. 1021, 1021 (1990).

On remand, the North Carolina Supreme Court held that the unanimity instruction was indeed unconstitutional under *McKoy. State v. Allen*, 417 S.E.2d 227, 228 (N.C. 1992). The court nonetheless affirmed Allen's death sentence finding the error "harmless beyond a reasonable doubt" based solely on the jurors' responses to a post-verdict poll. *Id.* at 228.

Allen then filed this motion for habeas relief, challenging the North Carolina Supreme Court's finding that the concededly unconstitutional instruction constituted harmless error. The district court, although eventually rejecting Allen's claim, granted a certificate of appealability with respect to this issue. Thus, the district court recognized that Allen had made a substantial showing of the denial of a constitutional right. *See Slack*, 529 U.S. at 483. Because Allen has made this showing, we, the plurality, proceed directly to the merits of his claim.

As noted above, we may grant Allen habeas relief only if his claim meets the criteria for relief as detailed in § 2254(d)(1) of the AEDPA. Pursuant to that statute, the state court decision must either be contrary to, or involve an unreasonable application of, clearly established federal law as determined by the Supreme Court. *See Williams*, 529 U.S. at 411. As the Court has recently reiterated, "§ 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning," and provide independent bases for habeas relief. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal habeas court may grant relief under the "contrary to" clause if "the state court applies a rule different from the governing law set forth in [Supreme Court precedent], or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Id.* Alternatively, a writ can issue under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [Supreme Court precedent] but unreasonably applies it to the facts of the particular case." *Id.* A writ cannot issue merely because a "state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Williams*, 529 U.S. at 411.

In this case, Allen is not entitled to relief on his jury instruction claim under the "contrary to" clause. The state court properly identified the governing law — both the holding in *McKoy* that North Carolina law imposing a unanimity requirement on mitigating circumstances is unconstitutional, and the proper harmless error standard.[1] Moreover, Allen does not contend the state court unreasonably applied the governing law with respect to *McKoy* itself. After all, the state court held that the unanimity instruction employed in Allen's sentencing proceeding was unconstitutional. Allen does contend, however, that he is entitled to relief under the "unreasonable application" clause because the state court unreasonably applied the harmless error standard, as articulated in *Chapman v. California*, 386 U.S. 18, 24 (1967), to the facts of his case.

The North Carolina Supreme Court found the *McKoy* error to be "harmless beyond a reasonable doubt" based solely on the results of a post-verdict poll of the jury. *Allen*, 417 S.E.2d at 228. The court recounted:

> The clerk then polled the jurors by stating to each of them each mitigating circumstance and whether it was found or not. The clerk asked each juror whether these were the answers to "your issues," whether these were still the answers to the issues and whether he or she still assented thereto. Each juror answered in the affirmative.
>
> *It appears from this poll that the jury was unanimous as to each of the mitigating circumstances which the jury failed to find.*

---

[1]The Supreme Court has directed that when considering a case on direct appeal, a court can find a constitutional error harmless only if "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder v. United States*, 527 U.S. 1, 15 (1999) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) (holding that "an otherwise valid conviction [or sentence] should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless *beyond a reasonable doubt*" (emphasis added)).

*Id.* (emphasis added). Thus, on the basis of each juror's responses to a routine post-verdict jury poll, N.C. Gen. Stat. § 15A-1238 (providing that after return of a criminal verdict, upon motion of either party or judge's own motion, each juror be polled as to whether the verdict announced is his or her verdict), the court reasoned that giving the unconstitutional jury instruction constituted harmless error beyond a reasonable doubt. *Allen*, 417 S.E.2d at 228. The North Carolina Supreme Court concluded that resentencing was not necessary because this poll established that no individual juror voted for any of the seven mitigating circumstances that the collective jury had not unanimously found.

In doing so, the North Carolina Supreme Court placed inordinate reliance on a poll that was never designed to, nor did it, cure the *McKoy* error. Rather, as is evident from even a cursory review of its substance, the poll merely confirmed that each juror followed the trial court's unconstitutional instruction in sentencing Allen to death.

When the clerk polled each juror, she read the entire verdict form, which not only specifically asked, "Do you *unanimously* find from the evidence the existence of one or more of the following mitigating circumstances?"; but also stated, "In the space after each mitigating circumstance, write 'yes,' if you *unanimously* find that mitigating circumstance by a preponderance of the evidence. Write, 'No,' if you do not *unanimously* find that mitigating evidence." (J.A. 137) (emphasis added). After reading through all of the proffered mitigating circumstances, the clerk queried the jurors if there were "[a]ny other circumstance or circumstances arising from the evidence which you, *the jury*, deem to have mitigating value." (J.A. 106) (emphasis added). That is, in the verdict form, the term "you" was defined in the collective, referring to "you, the jury." Importantly, no juror was ever asked how he or she individually voted on any of the mitigating circumstances. Instead, after reading the verdict form along with the jury's collective responses, the clerk asked each juror, "Are these the answers to your issues?," "Are these still the answers to the issues?," and "[D]o you still assent thereto?" (J.A. 107).

The clerk's questions imply that jurors were not being asked for their individual votes on the mitigating circumstances, but rather, that they were being asked if they still assented to the jury's collective

decisions. This is a vital distinction. A juror might recognize that he would have found the existence of a mitigating circumstance had he been permitted to consider the question on his own. However, he would also recognize that the jury did not unanimously find the existence of that circumstance, and so he would be compelled to "still assent" to the jury's collective decision not to consider that circumstance, regardless of how he individually voted on the matter.

As the Supreme Court has explained, the unanimity requirement is unconstitutional because it "allows one holdout juror to prevent the others from giving effect to evidence that they believe calls for a sentence less than death." *McKoy*, 494 U.S. at 439 (internal quotation marks omitted). "Moreover, even if all 12 jurors agree that there are *some* mitigating circumstances, . . . [a unanimity requirement] prevents them from giving effect to evidence supporting any of those circumstances in their deliberations . . . unless they unanimously find the existence of the *same* circumstance." *Id.* The damage done by imposing a unanimity requirement is that it prevents a juror who found the existence of a mitigating circumstance from fully participating in the jury's deliberations as to death. The requirement bars him or her from bringing his or her appreciation of that mitigating circumstance to bear on the jury's collective sentencing decision.

It is at this critical stage — where we must attempt to understand the effects of the unanimity requirement on the jury's internal deliberations — that the post-verdict poll fails to provide any meaningful insight. The poll did not, and could not, shed light on the critical issue of whether any individual juror voted for a given mitigating factor. In short, the post-verdict poll reveals nothing about the individual votes by the jurors on the seven mitigating circumstances that the jury did not unanimously find. As Justice Blackmun observed, such a poll "tells us nothing about how the juror would have voted — either on a particular mitigating circumstance or on the ultimate life-or-death question — had he been instructed that he could give effect to all the mitigating evidence, as the Constitution requires." *Price v. North Carolina*, 512 U.S. 1249, 1251 (1994) (Blackmun, J., concurring in the grant of certiorari).

Therefore, we find that in determining that this post-verdict poll rendered the *McKoy* error harmless, the North Carolina Supreme

Court's application of *Chapman*'s governing legal principles was objectively unreasonable, resulting "in a decision that . . . involved an unreasonable application of clearly established Federal law." 28 U.S.C. § 2554(d)(1).[2] Accordingly, "the requirements of § 2254(d) . . . pose no bar to granting petitioner habeas relief." *Wiggins*, 123 S. Ct. at 2539.[3]

Although the jury poll was the sole basis for the state court's (unreasonable) determination that the *McKoy* error was harmless, and

---

[2]The North Carolina Supreme Court itself has recognized that, "it would be a rare case in which a *McKoy* error could be deemed harmless." *State v. McKoy* ("*McKoy II*"), 394 S.E.2d 426, 433 (N.C. 1990); *see also State v. Fullwood*, 404 S.E.2d 842, 844 (N.C. 1991) ("In light of the evidence adduced at trial, we cannot conclude . . . beyond a reasonable doubt that had . . . jurors been permitted, under proper instructions, to consider [the mitigating] circumstance, they nevertheless would have voted for the death penalty rather than life imprisonment."). The state court further opined, in dicta, as follows:

> A case in which there was little or no mitigating evidence proffered, or in which the jury found the existence of all proposed mitigating circumstances but nonetheless imposed the death penalty, could be a candidate for successful argument that a *McKoy* error was harmless, but we save decision on this point until such a case arises.

*McKoy II*, 394 S.E.2d at 433 n.4. The prosecution's case before this court, of course, is not nearly as strong as these two hypotheticals suggest it should be in order to support a finding of harmlessness. And, given that North Carolina courts have not given a unanimity instruction for over a decade, such a "rare case" is not likely to arise anytime in the future; indeed, *McKoy* errors in general should be a remnant of the past.

[3]Having found that the *analysis* employed by the state court was unreasonable, we could not properly deny relief under § 2254(d) on the basis that the *result* of the state court proceeding was not unreasonable. Such a conclusion would necessarily be premised on reasoning that was *not* relied on by the state court. Reasoning that the state court could have — but did not — employ must be evaluated de novo, without applying the deferential standard prescribed by § 2254(d)(1). *See Wiggins*, 123 S. Ct. at 2540. The *Wiggins* Court explained that § 2254 deference to a state court finding is simply not possible in these circumstances because "the State court made no such finding." *Id.*

it was also the *only* argument raised by the government on appeal to support this (unreasonable) determination, we may affirm on any ground supported by the record, even if it has not been raised by the parties. *See In re A.H. Robins Co.*, 880 F.2d 709, 748 (4th Cir. 1989), *abrogated on other grounds by Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). It is therefore appropriate for us to engage in the additional analysis mandated by *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

Under *Brecht*, 507 U.S. 619, a habeas petitioner is still not entitled to relief, despite having satisfied AEDPA criteria, unless the state court's unreasonable application of federal law had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637.[4] The *Brecht* standard, adopted from and first explicated in *Kotteakos v. United States*, 328 U.S. 750 (1946), requires a greater showing of prejudice than *Chapman*, *Brecht*, 507 U.S. at 637, but a lesser showing than the "reasonable probability" standard. *Kyles v. Whitley*, 514 U.S. 419, 435-36 (1995). Under the *Brecht* standard, the inquiry cannot be merely whether sufficient evidence "support[s] the result," or whether the jurors were "right in their judgment, regardless of the error or its effect upon the verdict," *Kotteakos*, 328 U.S. at 764-65; rather the proper inquiry must focus on whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 631-39. If a court "cannot say, with fair

---

[4]We note that some of our sister circuits have questioned whether *Brecht* remains applicable for habeas petitions filed after the effective date of AEDPA. *See Anderson v. Cowan*, 227 F.3d 893, 898 n.3 (7th Cir. 1999) (observing that the Sixth Circuit in *Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999), applied *Brecht* in a post-AEDPA setting, but that the Eighth Circuit, in *Whitmore v. Kemna*, 213 F.3d 431 (8th Cir. 2000), "indicated skepticism about the continued vitality of *Brecht*."). However, both this court and the Supreme Court have applied *Brecht* in post-AEDPA cases. *See Early v. Packer*, 537 U.S. 3, 10-11 (2002) (per curiam); *Penry v. Johnson*, 532 U.S. 782, 795 (2001); *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002). The Sixth Circuit has aptly summarized the propriety of *Brecht*'s continued viability, stating that the *Brecht* standard "quite precisely captures Congress's intent as expressed in AEDPA and, therefore, continues to be applicable." *Nevers v. Killinger*, 169 F.3d 352, 371 (6th Cir. 1999), *abrogated on other grounds by*, *Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000).

assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos*, 328 U.S. at 765.

Neither *Brecht* nor *Kotteakos* was a capital case, and thus they only addressed the question of the defendant's guilt or innocence, not the question of whether the defendant should be executed. Accordingly, we recognize that the *Brecht-Kotteakos* standard must be somewhat modified when applied in circumstances like those at issue here — the sentencing phase of a capital case. In this context, that standard requires a reviewing court to determine whether it can say "with fair assurance" that an error did not "substantially sway[ ]" the response of the jury to the question put before it, *i.e.*, should the defendant receive the death penalty. *Kotteakos*, 328 U.S. at 765. Moreover, in this context a reviewing court must undertake the *Brecht* analysis mindful of the Supreme Court's recognition that an appellate court faces certain difficulties when "determining sentencing questions in the first instance." *See Clemons v. Mississippi*, 494 U.S. 738, 754 (1990); *accord Caldwell v. Mississippi*, 472 U.S. 320, 330 (1985).

With these principles in mind, we turn to the application of the standard required by *Brecht* and *Kotteakos* to the facts at hand. We note at the outset that the jury poll at issue in this case was so woefully inadequate, for all the reasons outlined above, that it alone clearly did not render the *McKoy* error harmless even under the *Brecht* standard. We next examine whether, based on a more robust review of the record evidence beyond the jury poll, the *McKoy* error had a "substantial and injurious effect or influence" on the jury's sentencing recommendation in Allen's case. In particular, we ask whether we can conclude, with "fair assurance," that had the jurors been permitted to independently assess the additional mitigating evidence presented at Allen's sentencing proceeding, and weigh that evidence, along with the mitigating factors unanimously found, against the aggravating circumstances, they would nevertheless have voted for the death penalty. We cannot.

In this case, the trial judge found sufficient evidence to submit two aggravating factors and ten mitigating factors to the jury.[5] The jurors

---

[5]North Carolina law requires a trial judge to make an initial finding that the evidence presented at trial supported the propriety of submitting

unanimously found the existence of two aggravating factors: (1) murder committed for the purpose of avoiding a lawful arrest and (2) murder of a law enforcement officer while engaged in the performance of his official duties. They also unanimously found three mitigating factors to be present: (1) Allen had no history of crimes involving deadly weapons, (2) he expressed remorse for the victim's death, and (3) he earned a GED. However, because of the unconstitutional *McKoy* instruction, each juror was deprived of the ability to individually weigh the other seven mitigating factors.

North Carolina statutory law requires jurors to determine: (1) whether any sufficient aggravating circumstances exist; (2) whether any sufficient mitigators exist; and (3) after weighing these considerations, whether the defendant should be sentenced to life imprisonment or death. N.C. Gen. Stat. § 15A-2000(b); *see also State v. Hunt*, 582 S.E.2d 593, 598 (N.C. 2003); *State v. Barfield*, 259 S.E.2d 510, 542 (N.C. 1979). This sentencing scheme expressly prohibits the jury from considering *any* aggravating factors not listed in the statute (which does not contain a nonstatutory category or a catch-all provision), and limits the jurors' deliberations to weighing the relevant aggravating and mitigating factors. *See* N.C. Gen. Stat. § 15A-2000(b), (e); *see also Hunt*, 582 S.E.2d at 598; *Barfield*, 259 S.E.2d at 542. Our duty under *Brecht* is to determine what effect the admitted error had on the *jury's decision-making process*. In doing so, we recognize that the jury's process was carefully circumscribed by statutory dictates, limiting deliberation to *two* aggravating factors — that the murder was committed for the purpose of avoiding a lawful arrest and that the murder was of a law enforcement officer while engaged in the performance of his official duties — thus there is no legal basis to weigh the overall circumstances of the crime outside these two factors.

So we proceed, as we must, under the North Carolina statutory scheme, and in doing so further recognize that a North Carolina court

each aggravating or mitigating factor to the jury. N.C. Gen. Stat. § 15A-2000(b) ("In all cases in which the death penalty may be authorized, the judge shall include in his instructions to the jury that it must consider any aggravating circumstance or circumstances or mitigating circumstance or circumstances . . . which may be supported by the evidence . . . .").

may not impose death if a single juror votes in favor of life imprisonment. Indeed, "[i]f the jury cannot, within a reasonable time, unanimously agree to its sentence recommendation, the judge shall impose a sentence of life imprisonment . . . ." N.C. Gen. Stat. § 15A-2000(b). Accordingly, we must now assess whether we can say "with fair assurance," *Kotteakos*, 328 U.S. at 765, that not a single resolute juror would have voted for a life sentence.

In addition to the mitigating factors unanimously found by the jury (that Allen earned a GED degree, had no history of crimes involving deadly weapons, and expressed remorse for the victim's death) the defense offered evidence of seven other mitigating factors: (1) Allen's age, (2) his lack of significant criminal history, (3) his rearing in a single-parent home, (4) his parenting of three children, (5) his history of gainful employment, (6) his status as a supporting parent to a child, and (7) a catch-all category for other circumstances that the jury deemed to have mitigating value.

During Allen's sentencing proceeding, substantial evidence was presented to support several of these additional mitigating factors. However, we do not believe that any reasonable juror could have concluded that Allen presented sufficient evidence that his age — thirty at the time of the murder — should count as a sufficient mitigating factor. After all, a person of thirty cannot reasonably be characterized as too young to appreciate the seriousness of his crime. Further, although Allen's criminal history — convictions for shoplifting, breaking and entering, and burglary — does not involve convictions for violent offenses, and so in that respect is arguably "not significant" and thus could be considered mitigating, we do not believe any reasonable juror could conclude that this evidence added enough to the mitigating factors unanimously found (given that the jury had already found Allen's lack of history of crimes involving deadly weapons to be a mitigating factor) to outweigh the aggravating circumstances. Thus, if the *only* additional mitigating evidence Allen offered pertained to his age and prior criminal history, we believe the *McKoy* error here would be harmless.

But of course that is not the situation here. Allen offered evidence that from the time he was a young boy he was raised in a single-parent home, and although he had more frequent contact with his

father later in life, he only saw his father three or four times a year until he entered sixth grade. Further, Allen remained employed when he was not incarcerated, a fact that the dissent does not contest. And, in addition to the indisputable fact that Allen fathered three children, there was abundant evidence that he maintained an ongoing, supportive relationship with his eldest child, Timothy Jr. Indeed, Timothy Jr. was present at his father's sentencing hearing, at which his mother, Allen's long divorced ex-wife, unequivocally testified that Allen had a "very good" relationship with their son.

Furthermore, the jury heard a good deal of additional testimony that could qualify as another "circumstance . . . deem[ed] to have mitigating value." N.C. Gen. Stat. § 15A-2000(f)(9). For example, Allen presented substantial evidence that his parents engaged in physical fights in his presence, which petrified him. In fact, their ultimate separation and divorce resulted from one such fight that occurred during Allen's third birthday party in which the police were called.[6] Similarly, the jury heard evidence that Allen was a shy, timid person, bullied by others, who did not use firearms, and was unwilling or unable to fight back. And although Allen was never physically abused as a child, from an early age he lost himself in alcohol and drugs.

Given this evidence, we cannot say "with fair assurance" that no reasonable juror could have found these circumstances to have mitigating value. Nor can we conclude that precluding the jurors from individually weighing these last five mitigating factors *plus* the three unanimously found mitigators against the two aggravating circumstances did not "substantially sway[ ]" their decision to recommend that Allen be executed. *Kotteakos*, 328 U.S. at 765. Rather, there is a sufficient likelihood that at least one juror, after hearing this evidence and properly weighing all eight colorable mitigating factors against the two aggravating factors, would have been persuaded to spare Allen's life. This is not to suggest that Allen did not commit a horrible crime, nor that jurors would not properly consider the aggra-

---

[6]There is a minor factual discrepancy in the record concerning the timing of this incident. Allen testified that this fight occurred at his fifth birthday party. *See* Tr. at 3047, 3052-53. His mother, however, testified the fight and attendant separation occurred when her son was three. *See id.* at 3125-26.

vating circumstances — murder of a law enforcement officer performing his duties for the purpose of avoiding arrest — to be exacerbating. Nevertheless, we cannot say with any "fair assurance" that a reasonable juror would not have concluded, after properly weighing the aggravating factors against all eight mitigating factors, that Allen's life should be spared because, despite the terrible crime he committed, Allen exhibited some redeeming qualities — including efforts to overcome a less than ideal childhood and lead a productive life by obtaining a GED, finding employment, and providing ongoing emotional support for a son. There is a sufficient likelihood that these efforts, particularly given Allen's remorse for Trooper Worley's death, the loyalty Allen inspired in his ex-wife and son, demonstrated by his ex-wife's supportive testimony on his behalf and the presence of his son at the sentencing hearing, and the uncontradicted testimony that Allen had never before used a firearm to commit a crime, could well have swayed at least one of the twelve jurors to determine that Allen should be imprisoned for the rest of his life, rather than executed.

As the Supreme Court recognized in *Mills v. Maryland*, 486 U.S. 367, 374 (1988), even if all twelve jurors agreed that some of the non-unanimous mitigating circumstances were present, and further agreed that those mitigating circumstances (combined with the unanimously found mitigators) outweighed the aggravating factors, if the jurors disagreed as to the particular mitigating circumstances because of the unconstitutional instruction, they would never be permitted to "engage in the [proper] weighing process or any deliberation on the appropriateness of the death penalty." *Id.* Indeed, even if eleven jurors agreed that five non-unanimous mitigating factors were present, under the unconstitutional jury instruction they could have found *no* additional mitigating circumstances. *Id.* Thus, instead of those eleven jurors weighing eight mitigating circumstances against the two aggravating factors, they were only permitted to weigh the three mitigating circumstances on which they were unanimous. Recognizing that all aggravating and mitigating factors do not warrant the same weight, and that jury deliberations are an inexact science at best, this means that a possible fifty-five additional votes (eleven jurors times five factors) could have been cast in favor of mitigation. Any one of these fifty-five possible votes could, in turn, have formed the basis for a decision against the imposition of the death penalty. When the sub-

stantial evidence presented is evaluated in light of the broad discretion conferred on jurors in capital sentencing proceedings, we find ourselves unable to say, as we must to uphold a sentence of death, that *none* of the jurors would have been persuaded to vote for life imprisonment instead.[7] After all, it only takes one hold-out juror to prevent the imposition of the death penalty, and in this case, we cannot say with "fair assurance" that no juror would have been swayed by the mitigating factors that the jurors were unlawfully precluded from individually considering, including the highly discretionary catch-all factor, particularly when combined with the unanimously found mitigating factors.

Judges Luttig and Williams, of course, reach a contrary conclusion. In the view of Judge Williams, the effect of the mitigating factors unlawfully kept from individual consideration by the jurors is so minimal that she can conclude, with "fair assurance," that the judgment was not substantially swayed by the error. *Post* at 56. We respectfully disagree with Judge Williams' conclusion. Her approach does not appear to adequately acknowledge the possible cumulative impact of the additional mitigating factors. Even if a juror might not have found that each of those additional factors independently outweighed the aggravators, a reasonable juror well could have concluded to the contrary when considering those factors *collectively*, *and in addition* to the three unanimously found mitigators. A reasonable juror could have determined, when the *additional* evidence as to Allen's difficult

---

[7]Indeed, a juror, when given the appropriate latitude to consider such mitigating evidence, may decline to impose the death penalty even for crimes that are "especially heinous, atrocious, or cruel." *See State v. Stokes*, 352 S.E.2d 653, 665 n.14 (N.C. 1987) (citing twenty cases involving twenty-four defendants in which the jury "recommended life imprisonment despite finding the [statutory aggravating factor rendering the] murder . . . especially heinous"); *see also State v. Meekins*, 392 S.E.2d 346, 347-48 & n.1 (N.C. 1990)(defendant was sentenced to life for first-degree murder despite finding of "heinous, atrocious, or cruel" aggravating factor based on repeatedly stabbing to death a seventy-nine year old woman); *State v. Wilds*, 515 S.E.2d 466, 472 (N.C. App. 1999) (defendant was sentenced to life on first-degree murder conviction despite finding of "heinous, atrocious, or cruel" aggravating factor based on the fact that defendant repeatedly stabbed his wife to death in front of their children).

childhood, his ongoing emotional support of his son, and his employment are considered along with Allen's genuine remorse for the murder, his achievement while incarcerated, and his lack of history of crime involving deadly weapons, that those mitigating factors outweighed the two aggravating circumstances. *Cf. Caldwell*, 472 U.S. at 330 ("Whatever intangibles a jury might consider in its sentencing deliberation, few can be gleaned from an appellate record. This inability to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of what this Court has termed '[those] compassionate or mitigating factors stemming from the diverse frailties of humankind.'") (citation omitted).

A reviewing court's proper role in determining an error's harmlessness entails an individualized inquiry of the sort in which we have engaged here. The inquiry before us is "not [whether these laymen] were right in their judgment, regardless of the error or its effect upon the verdict" but "rather what effect the error had or reasonably may be taken to have had upon the jury's decision." *Kotteakos*, 328 U.S. at 764. Long ago the Supreme Court cautioned that in assessing whether an error is harmless, an appellate judge is to determine jurors' "reactions *not by [the judge's] own*, but with allowance for how others might react and not be regarded generally as acting without reason." *Kotteakos*, 328 U.S. at 764 (emphasis added). Thus, the Court directed: "The crucial thing is the impact of the thing done wrong, on the minds of other men, not on one's own, in the total setting." *Id.*

Our assessment of the harmlessness of an error is particularly significant in this case because of the character of the proceedings at issue — a sentencing hearing held to determine whether a man lives or dies. In reviewing for harmless error, the Supreme Court has told us that a court is to consider "the character of the proceeding, what is at stake upon its outcome, and the relation of the error asserted to casting the balance for decision on the case as a whole." *Kotteakos*, 328 U.S. at 762. This does not mean that we apply a different harmless error standard in capital cases, but we must apply the standard with the utmost care, *see Caldwell*, 472 U.S. at 329 ("[U]nder the Eighth Amendment the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of

the capital sentencing determination.") (internal quotation marks and citation omitted), and with due acknowledgment of the fact that the jury retains great discretion in determining whether to impose the death penalty on a capital defendant, *see Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994) (stating that "the sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty") (internal quotation marks and citations omitted). That the error here denied jurors the right to consider a number of mitigating factors in reaching that important, and largely discretionary, decision is particularly problematic because it deprives us of any "fair assurance" that all jurors would have nonetheless voted for death.

Having conscientiously applied the Supreme Court's directives, we cannot say with fair assurance that the *totality* of the mitigation evidence weighed against the two aggravating factors would not have swayed at least one juror to spare Allen's life. Thus, we hold that the *McKoy* error had a "substantial and injurious effect or influence in determining the jury's verdict" warranting habeas relief under *Brecht*. At a minimum, the likelihood that a properly-instructed jury would not have voted to unanimously impose the death penalty is sufficiently great to raise "grave doubt" as to whether the *McKoy* error was harmless. *See O'Neal v. McAninch*, 513 U.S. 432, 435 (1995) (holding that when "grave doubt" exists in a habeas case, "[w]e conclude that the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (*i.e.*, as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')"). Because the *Brecht* standard does not require even a reasonable probability that the error in question affected the outcome of the proceeding, *see Kyles*, 514 U.S. at 436, we find a "substantial and injurious effect" as well. Therefore, we join the judgment on the *McKoy* issue and hold that Allen is entitled to habeas relief under *Brecht*.[8]

(Text continued on page 50)

---

[8]Lastly, we respond to Judge Luttig's assertion that "the court has been in violation of the statutory time limitations governing this case for over eight months already," *post* at 55, and that "the *en banc* court was obligated to have decided the case no later than July 22, 2003." *Post* at 54. First, Judge Luttig rightfully concedes that we are not, in fact, bound by AEDPA itself, but are bound by Judicial Council Order No. 113 which

adopts § 2266's time limitations. Section 2266 of AEDPA applies *only* to "opt-in" states. Section 2261 of title 28 provides that a state must meet specific, "opt-in" requirements to obtain expedited habeas review. 28 U.S.C. § 2261(a)-(c); *see also Calderon v. Ashmus*, 523 U.S. 740, 742 (1998) (explaining that a state must meet the criteria to invoke expedited review). In *Keel v. French*, 162 F.3d 263, 267 n.1 (4th Cir. 1998), we explained that North Carolina had *not* opted-in to these procedural requirements. *See also Sexton v. French*, 163 F.3d 874, 876 n.1 (4th Cir. 1998) (same). At no time during the pendency of this case has North Carolina argued that it has complied with AEDPA's opt-in requirements, yet it bears the burden of establishing such compliance to be entitled expedited habeas review. *See, e.g.*, *Hall v. Luebbers*, 341 F.3d 706, 711 (8th Cir. 2003); *Spears v. Stewart*, 283 F.3d 992, 1012 (9th Cir. 2002); *High v. Head*, 209 F.3d 1257, 1262 n.4 (11th Cir. 2000). Instead, Judge Luttig correctly points out that Order No. 113 of the Fourth Circuit Judicial Council, which imposes § 2266's time limitations, applies to our disposition of all capital cases. However, as we explained in *Truesdale v. Moore*, 142 F.3d 749, 758-60 (4th Cir. 1998), the scope and enforcement of this time limitation are entirely different from those under AEDPA itself. First, Order No. 113, unlike AEDPA, is a self-policing measure, not one enforceable by the state. In *Truesdale*, we made clear that this self-policing measure *may* be enforced by our Circuit Executive: "AEDPA gives *states* power . . . to enforce the time limits against courts of appeals 'by applying for a writ of mandamus to the Supreme Court,' 28 U.S.C. § 2266(c)(4)(B). By contrast, Order No. 113 provides simply that the *Circuit Executive* can monitor compliance with the timetable by inquiring into the reasons for the delay." 142 F.3d at 759; *id.* at 758 ("[T]he Circuit Executive *may* seek an explanation of the reasons why the court has not complied with the time limitations." (emphasis added)); *see also* Judicial Council Order No. 113 ¶ 3 (Oct. 3, 1996) (stating that "the Circuit Executive is authorized to inquire into the reasons for any noncompliance"). Not only is the provision discretionary rather than mandatory, but in *Truesdale* we stated that if the "court needed to hold a case for a critical decision of the Supreme Court or the Fourth Circuit" that would be one reasonable explanation for noncompliance *if the Circuit Executive were to inquire*. 142 F.3d at 758. Here, the Circuit Executive has not inquired into the reasons for our noncompliance with this rule. If the Circuit Executive had inquired, we would most certainly have explained that while we attempt to resolve federal capital cases most expeditiously and in full compliance with Order No. 113, we do not do

NIEMEYER, Circuit Judge, dissenting from the judgment on the *McKoy* issue:

During the sentencing phase of trial, the State trial court submitted a form to the jury which, together with the trial court's instructions, instructed the jury that it could find or reject mitigating circumstances only by a unanimous vote. Of ten mitigating circumstances submitted to the jury, the jury found unanimously that three existed and seven did not. The jury then found unanimously that these mitigating circumstances were "insufficient to outweigh the aggravating circumstance or circumstances" and that the aggravating circumstances, considered in light of the mitigating circumstances, were "sufficiently substantial" to call for the imposition of the death penalty.

The United States Supreme Court granted a writ of certiorari and, in light of its decision in *McKoy v. North Carolina*, 494 U.S. 433 (1990), vacated the State court judgment and remanded the case to the North Carolina Supreme Court for reconsideration in light of *McKoy*. *Allen v. North Carolina*, 494 U.S. 1021 (1990).

The North Carolina Supreme Court reconsidered the trial record and found that the jury form and instructions had indeed violated the principles of *McKoy* but that, in light of a jury poll that had been conducted by the trial court, the error was "harmless beyond a reasonable doubt." *State v. Allen*, 417 S.E.2d 227, 228 (N.C. 1992). The United States Supreme Court denied Allen's petition for a writ of certiorari

---

so at the expense of fair administration of justice, or at the expense of stifling good faith debate on the court — including inhibiting any member of the court from writing to express his or her views. Indeed, we could point to the fact that this case has resulted in a most productive and spirited discussion among the judges of this court, as evidenced by the nine separate opinions we release today, and the proper administration of justice benefits from such a robust discourse even when some delay results. Under *Truesdale*, this is another reasonable explanation for our noncompliance had the Circuit Executive so inquired. In sum, it is premature to conclude that the court has violated Order No. 113 before the Circuit Executive has made the required inquiry and the appropriate authority has determined that the court had no valid reason for noncompliance.

to review the North Carolina Supreme Court's decision on reconsideration. *Allen v. North Carolina*, 507 U.S. 967 (1993).

Allen raised the *McKoy* issue again in the district court on a petition for writ of habeas corpus, and the district court concluded that the North Carolina Supreme Court's decision was not an unreasonable application of federal law. Accordingly, it denied the writ.

In *McKoy*, the Supreme Court applied its decision in *Mills v. Maryland*, 486 U.S. 367 (1988), to hold that the requirement in North Carolina that a jury find mitigating evidence by a unanimous verdict violates the U.S. Constitution "by preventing [each juror as] sentencer from considering all mitigating evidence." 494 U.S. at 435. If a unanimous verdict on mitigating evidence were required, then only one juror could foreclose others' consideration of mitigating evidence, thus denying each juror the possibility of considering the mitigating evidence in casting a vote for the death penalty. *Id.* at 443. The Court explained that "[t]he unanimity requirement thus allows one holdout juror to prevent the others from giving effect to evidence that they believe calls for a sentence less than death." *Id.* at 439 (internal quotation marks and citations omitted). In sum, the Court concluded that "*each juror* must be allowed to consider all mitigating evidence in deciding . . . whether aggravating circumstances outweigh mitigating circumstances, and whether the aggravating circumstances, when considered with any mitigating circumstances, are sufficiently substantial to justify a sentence of death." *Id.* at 443 (emphasis added).

Applying *McKoy* to the circumstances in this case, the North Carolina Supreme Court concluded that the verdict form and the instructions given in connection with it violated the principles of *McKoy* and therefore constituted trial error. But the error, it found, had no effect on the trial because the trial court conducted a poll of the jurors which revealed that *the individual* jurors' votes were "unanimous as to each of the mitigating circumstances which the jury failed to find." *Allen*, 417 S.E.2d at 228. The court held that the error, therefore, "was harmless beyond a reasonable doubt." *Id.*

Because I conclude that the North Carolina Supreme Court's decision was not an unreasonable application of clearly established federal law as determined by the Supreme Court, I agree with the district

court that the writ of habeas corpus must not be granted with respect to the *McKoy* error. *See* 28 U.S.C. § 2254(d)(1).

Because the North Carolina Supreme Court correctly identified the relevant Supreme Court standards, *compare Allen*, 417 S.E.2d at 228, *with Chapman v. California*, 386 U.S. 18, 24 (1967), the only question we must answer in applying § 2254(d)(1) is whether the North Carolina Supreme Court's conclusion that the *McKoy* error was harmless beyond a reasonable doubt was an unreasonable application of *Chapman*.

A detailed examination of North Carolina's application of the *Chapman* standard shows that it was not unreasonable. Under the process followed by the State trial court, the *individual vote* of each juror can be determined on the record with respect to each mitigating circumstance. Because the individual jurors' votes on the mitigating circumstances were unanimous, the unconstitutional possibilities that could have resulted from a *McKoy* error never happened in this case. If the trial court had relied only on the verdict form returned by the jury, I would agree that we could not determine whether or not the *McKoy* error had tainted the verdict because we could not determine whether one juror or a few jurors had frustrated the finding of mitigation by other individual jurors so that the others could not consider their finding of mitigating evidence in voting on the death penalty. But the trial court's poll removed any doubt on this issue.

After the jury returned its verdict and the clerk read it in open court, the trial judge conducted a poll instructing the jury as follows:

> Members of the jury, at this time I am going to ask that Madam Clerk, when she is ready, poll each of you. This is the same procedure that we used on Monday. *You will be asked individually* as to your answers to the issues and as to the recommendation.

(Emphasis added). Each individual juror was then polled on the verdict form, including the answers to each of the mitigating circumstances, and asked, "Are these the answers to your issues" and "And do *you* still assent thereto?" (Emphasis added). In each case, the juror said "yes." Then each individual juror was asked whether the recom-

mendation of the death penalty was "still *your* recommendation" (emphasis added) and whether the individual juror "still assent[ed] thereto." Again, in each case, the juror responded that this was his or her individual recommendation. Because each juror *individually* indicated that the vote on the ten mitigating factors was also his or her individual vote, the verdict on the mitigating factors was in fact unanimous, and the *McKoy* error did not deny any juror the opportunity to consider his or her individual finding of a mitigating circumstance.

Accordingly, I would conclude that the decision of the North Carolina Supreme Court finding the *McKoy* error harmless was not an unreasonable application of *Chapman*. The court clearly understood the holding in *McKoy*, and it determined whether any individual juror's views on mitigating evidence were suppressed by the unanimity requirement, concluding that no individual juror's view on a mitigating circumstance was over-voted.

I am authorized to say that Judge Wilkinson concurs in this opinion dissenting from the judgment on the *McKoy* issue.

LUTTIG, Circuit Judge, concurring in the judgment and dissenting:

I do not join in any portion of the court's opinion. I do, however, agree with the conclusions reached by the court in Parts III, IV, and V of its opinion. For reasons that I will offer expeditiously (subject only to any time needed by my colleagues to prepare response), I dissent from the court's judgment on the *McKoy* issue.

This case was first argued before a panel of the court on September 25, 2002. The panel issued its decision and opinion on February 5, 2003, and a corrected opinion on February 14, 2003. Because more than 120 days had elapsed between the filing of the petitioner's reply brief on September 3, 2002, and the date that the panel issued its decision and opinion, the panel was in violation of the time limitations set forth in 28 U.S.C. § 2266(c)(1)(A), as adopted by this circuit's Judicial Council, at the time that it issued its decision and opinion.

We issued our order directing *en banc* consideration of the case on March 24, 2003, and the case was argued before the court *en banc* on June 4, 2003, almost a year ago.

Under the time limitations established by federal statute, 28 U.S.C. § 2266(c)(1)(B)(ii), as adopted by this circuit's Judicial Council, the *en banc* court was obligated to have decided the case no later than July 22, 2003.* Thus, we are already eight months beyond the date by which we were statutorily required to decide this case.

---

*In 1996, the Judicial Council of the Fourth Circuit adopted the time limitations set forth in section 2266 for decision of habeas petitions in all capital cases, regardless of whether the state from which the capital case originates has opted-in or not. *See* Judicial Council Order No. 113 (4th Cir. Oct. 3, 1996); *see also Truesdale* v. *Moore*, 142 F.3d 749, 758 (4th Cir. 1998) ("Order No. 113 imposes on district courts and the circuit court a timetable for deciding petitions brought under 28 U.S.C. § 2254 and 2255 by defendants who are under sentence of death."). In *Truesdale*, this court rejected the claim that Order No. 113 conflicted with AEDPA (by adopting the time limitations of section 2266 regardless of whether a state had opted-in and thereby "disrupt[ing] the statute's incentive structure") and emphasized that in adopting Order No. 113, the Judicial Council "simply exercised its recognized power to address . . . [the] problem of delay in collateral review of capital convictions and sentences." *Truesdale*, 142 F.3d at 759. Pursuant to 28 U.S.C. § 332(d)(2), orders of a circuit judicial council are binding on all judicial officers in the circuit, and may be enforced through contempt proceedings. Thus, under Order No. 113, which binds all of the judges in this circuit on pain of contempt, we *were obligated* to decide this case by the deadlines set forth in 28 U.S.C. § 2266.

Contrary to Judge Gregory's assertion, it is not the case that we only violate the time limitations of Order No. 113 if the Circuit Executive has inquired into our delay and found it unjustified. An inquiry by the Circuit Executive, which Order No. 113 "authorize[s]," or even a determination after a contempt proceeding brought by the Judicial Council itself that we have no valid reason for violating these time limitations, for which 28 U.S.C. § 332 (d)(2) provides, is, at most, a predicate to reprimand, not a precondition to violation of Order No. 113. In fact, Judge Gregory's own acknowledgment of this court's "noncompliance" with Order No. 113, *ante* at 48-49 n.8, proves that even he accepts this to be so. Instead, it is plain that our statutory obligation to follow such orders exists irrespective of an inquiry by the Circuit Executive. *See* 28 U.S.C. § 332 (d)(2) ("All judicial officers and employees of the circuit shall promptly carry into effect *all* orders of the judicial council.") (emphasis added). In short, that the time limitations may be "self-policing" does not mean that they are not obligatory, just as the simple fact that the Circuit Executive has not yet inquired into our non-compliance with those limitations does not mean that we are not in violation of them.

In my judgment, for reasons internal to the court, the opinion writing process is not likely to conclude in the immediately foreseeable future. However, it is clear at this time that the members of the court have come to rest on the disposition of the case.

Because the court has been in violation of the statutory time limitations governing the decision of this case for over eight months already, there is in my judgment no final set of opinions immediately forthcoming, and the members of the court have come to rest on the final disposition of the case, I believe that the only responsible course is for the court to issue those opinions that are final at this time, which opinions represent the court's decision in the case, and for any further separate opinions, including my own dissent, to be filed in due course following announcement of the court's judgment and decision. This is the course adopted by the court today, and, given the circumstances, it is a course of which I approve.

In order to expedite and facilitate the completion of the opinions for the court in this case, the State of North Carolina should promptly decide whether to move the court for reconsideration of today's decision and, if it chooses to seek reconsideration, file the appropriate papers, after which the petitioner may file responsive papers. If the state chooses not to move the court for reconsideration, it is my understanding that the majority judgment and opinion issued today, together with the separate opinions filed, will become the final judgment and set of opinions in the case, absent *sua sponte* action by a member of the court.

WILLIAMS, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I, II, III, IV, and V of the court's opinion. I write separately to dissent from the court's judgment on the *McKoy* issue. To obtain habeas relief based on trial error, a habeas petitioner must establish that "the error 'had substantial and injurious effect or influence in determining the jury's verdict.' "*Brecht v. Abrahamson*, 507

---

*I note that Judge Gregory properly recognizes that the same *Brecht*/*Kotteakos* harmless error standard applies to both capital and non-capital proceedings. *See ante* at 47-48; *see also Rouse v. Lee*, 339 F.3d

U.S. 619, 637 (2003) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). I respectfully disagree with the majority's conclusion that the error in this case warrants habeas relief. Given the jury's finding of two specific aggravating factors related to Allen's brutal and terrible murder of Trooper Worley, the mitigating circumstances that the faulty jury instruction prevented the jury from considering, and the three mitigating circumstances that the jury unanimously found to exist but unanimously found insufficient to outweigh the aggravating factors, I believe that one can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," *Kotteakos*, 328 U.S. at 765, and thus that the error did not have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 637. Accordingly, I respectfully dissent from the court's judgment on the *McKoy* issue.

GREGORY, Circuit Judge, dissenting from the court's opinion given in Part V:

In this Part, I write in dissent from the court's opinion in Part V.

Allen contends that his Sixth and Fourteenth Amendment rights were violated under *Batson v. Kentucky*, 476 U.S. 79 (1986). The district court granted Allen a certificate of appealability on this issue. Thus, Allen has already made "a substantial showing of the denial of a constitutional right." *Slack*, 529 U.S. at 484. Accordingly, we can proceed to the substance of Allen's claim.

Allen contends that the prosecution violated his constitutional rights by using eleven of thirteen (84.6%) peremptory challenges against otherwise qualified African American members of the venire, while the venire consisted of only 24 (36.3%) African Americans.

---

238, 254 (4th Cir. 2003) (en banc) ("[A]ny distinctions between the procedures required in capital and noncapital cases are primarily relevant to trial . . . ." (internal quotation marks omitted)), *cert. denied* 72 U.S.L.W. 3567 (Mar. 8, 2004); *cf. Satterwhite v. Texas*, 486 U.S. 249, 256-58 (1988) (holding that the same *Chapman* harmless error standard applies on direct review of both capital and noncapital cases).

Allen filed a pretrial motion on July 19, 1985, requesting additional peremptory challenges for the defense because the prosecutor had a "propensity toward excluding blacks from trial juries by use of his peremptory challenges." (S.J.A. at 2.) The trial court denied this motion and proceeded with trial. Upon Allen's conviction and sentencing, Allen brought a direct appeal to the North Carolina Supreme Court, which the court dismissed. For the reasons articulated below, I would hold that the North Carolina Supreme Court's *Batson* analysis is contrary to clearly established federal law, as determined by the Supreme Court.

A

Before considering Allen's *Batson* claim on the merits, however, I first address whether defense counsel has adequately preserved a *Batson* objection. Allen's trial took place pre-*Batson*, when the governing law on racial discrimination in jury selection was *Swain v. Alabama*, 380 U.S. 202 (1965).[1] Under *Swain*, a defendant was required to "show the prosecutor's systematic use of peremptory challenges" to strike African American jurors "over a period of time." *Id.* at 227. Allen's attorneys attempted to meet this burden by filing a pretrial motion focusing on the State's history of excluding African American jurors. Because *Swain* asked a trial court to consider the government's use of strikes "over time" rather than in the specific case before the court, Allen's motion was denied before the prosecution had used a single peremptory challenge, and Allen never raised the objection again. Thus, the issue before this Court is whether a pretrial motion alleging that the prosecution has shown a propensity toward excluding African American jurors is sufficient to preserve a *Batson* claim on appeal.

The Supreme Court considered this question in *Ford v. Georgia*, 498 U.S. 411 (1991). In *Ford*, an African American defendant, James A. Ford, filed a pretrial "'Motion to Restrict Racial Use of Peremptory Challenges,' alleging that the prosecutor . . . had 'over a long period of time' excluded black persons from juries. . . ." *Id.* at 413-14.

---

[1]Although *Batson* had not been decided at the time that Allen went to trial, *Batson* can be applied retroactively to cases on direct appeal. *See Teague v. Lane*, 489 U.S. 288, 295 (1989).

Although the defendant failed to cite any legal authority, the Supreme Court interpreted his motion as effectively raising an objection under *Swain*. *Id.* at 418. The Court explained, "[w]e think petitioner must be treated as having raised such a claim, although he certainly failed to do it with the clarity that appropriate citations would have promoted." *Id.* Following the trial court's denial of this motion, "the prosecution exercised 9 of its 10 peremptory challenges to strike black prospective jurors, leaving 1 black venire member on the jury." *Id.* at 415. Ford did not object to the use of peremptories as to any of these individual jurors. Rather, he waited and raised the *Swain* issue for a second time in a post-conviction motion for a new trial. *Id.* at 416.

The Supreme Court ruled that Ford's initial, pretrial motion was sufficient to preserve the *Batson* issue on appeal. Writing for a unanimous Court, Justice Souter stated:

> Both *Swain* and *Batson* recognized that a purposeful exclusion of members of the defendant's race from the jury selected to try him would work a denial of equal protection. . . . Because *Batson* did not change the nature of the violation recognized in *Swain*, but merely the quantum of proof necessary to substantiate a particular claim, it follows that a defendant alleging a violation of equal protection of the law under *Swain* necessarily states an equal protection violation subject to proof under the *Batson* standard of circumstantial evidence as well.

*Id.* at 420.

Following *Ford*, several of our sister circuits have elaborated on when a defendant should be deemed to have waived a *Batson* claim. In *Wilkerson v. Collins*, 950 F.2d 1054, 1062-63 (5th Cir. 1992), the Fifth Circuit considered a *Batson* claim brought by a defendant who failed to object to the prosecution's use of peremptory challenges before trial, during jury selection, or at any other time during the trial. The State argued that "notwithstanding the retroactivity of *Batson*, [the defendant] forfeited review as a matter of law by his failure to lodge a contemporaneous objection . . . ." *Id.* at 1063. The Fifth Circuit agreed, reasoning, "[a] contemporaneous objection would have

provoked court consideration of this alleged misconduct at a point *before trial* where it could have been readily corrected." *Id.* (emphasis added). In *Lockett v. Anderson*, the Fifth Circuit reaffirmed this rule, explaining that "we find no evidence that any inquiry was made as to the prosecutor's rationale for excluding all black members of the jury pool. . . . Thus, we have no facts or arguments before us upon which to base a *Batson* inquiry." 230 F.3d 695, 706 (5th Cir. 2000). Similarly, the Second Circuit has focused on the fact that "the nature of the peremptory challenge mandates that any objection to its use be raised and ruled upon promptly." *McCrory v. Henderson*, 82 F.3d 1243, 1247 (2d Cir. 1996). Thus, the court held, "the failure to object to the discriminatory use of peremptory challenges prior to the conclusion of jury selection waives the objection." *Id.* at 1249. Because the defendant "did not raise any challenge until three and one half months after the conclusion of jury selection, he forfeited his *Batson* claim." *Id.*

In each of these cases wherein the *Batson* claim was waived, the court relied on a defendant's failure to make *any* challenge — either under *Batson* or *Swain*. The focus in each case was on whether the trial court had been afforded at least some minimal opportunity to address the constitutional objection, regardless of the form of that objection.

Consistent with this reasoning, the Eleventh Circuit has specifically held: "In cases . . . where the trial took place pre-*Batson*, a properly made *Swain* claim made in a pretrial motion is treated as a timely made *Batson* objection for the purpose of preserving the *Batson* issue for appeal." *Cochran v. Herring*, 43 F.3d 1404, 1409 n.7 (11th Cir. 1995). In *Cochran*, just as in the present case, the defendant, "before the actual striking of jurors began," filed a *Swain* motion based on the prosecution's history of systematically striking African American jurors. *Id.* at 1406. The trial court denied the motion, and defense counsel never raised the issue again, even though the prosecution eventually struck "seven of the nine black members of the venire panel." *Id.* Despite Cochran's failure to object to the use of peremptory challenges as to any specific juror, the Eleventh Circuit held that the pretrial *Swain* motion on its own was sufficient to preserve the *Batson* issue. *Id.* at 1409-10. *See also Wright v. Hopper*, 169 F.3d 695, 708-09 (11th Cir. 1999) (holding that defendant was barred from

bringing a *Batson* claim because he failed to raise such a claim at "trial, or on direct appeal, or in his state coram nobis proceeding").

Allen, like the defendants in *Ford* and *Cochran*, presented the trial court with a pretrial motion arguing that "the Prosecutor has shown a propensity toward excluding blacks from trial juries by use of his premptory [sic] challenges in cases wherein the Defendant is a black person, and the Defendant expects that the Prosecutor will follow that practice in this case." (S.J.A. at 2.) With this language, Allen effectively raised an objection under *Swain*. *See Ford*, 498 U.S. at 418.

In suggesting a remedy, Allen requested that the trial court grant him additional peremptory challenges in order to blunt the government's efforts at discrimination. (S.J.A. at 1.) The better remedy might have been to directly prohibit the prosecution from using its peremptories in a racially discriminatory manner. However, regardless of the remedy sought, the fact remains that Allen properly raised the *Swain* issue to the trial court. As the Second Circuit explained:

> If the objection is raised during jury selection, the error is remediable in any one of a number of ways. Challenges found to be abusive might be disallowed; if this is not feasible . . . additional jurors might be called to the venire and *additional challenges granted to the defendant*; or in cases where those remedies are insufficient, the jury selection might begin anew with a fresh panel. If, on the other hand, a *Batson* objection may be raised after the jury has been sworn and trial has begun, there can be no remedy short of aborting the trial.

*McCrory*, 82 F.3d at 1247 (emphasis added) (internal citations omitted). In short, the focus is not on whether a defendant requested a particular kind of relief, but rather, whether he provided the trial court with an opportunity to correct the constitutional violation before the jury was empaneled. In this case, Allen's pretrial motion achieved this result, and therefore it is sufficient to preserve Allen's *Batson* claim.[2]

---

[2]I note that the Third Circuit has recently considered a case in which, unlike the case at hand, no adequate contemporaneous objection pre-

In sum, consistent with the Supreme Court and each circuit to have considered the question, I would find that Allen's *Swain* motion is a sufficient contemporaneous objection to preserve the *Batson* issue for this habeas petition. Thus, I now turn to the substance of Allen's *Batson* claim.

B

In conducting a *Batson* hearing, a court must first determine whether a defendant can show that: (1) the defendant is a member of a cognizable racial group; (2) the prosecutor used the challenges to remove members of the defendant's race from the venire; and (3) other facts and circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in his or her use of peremptory challenges. *Batson*, 476 U.S. at 96-97; *Keel v. French*, 162 F.3d 263, 271 (4th Cir. 1998). "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson*, 476 U.S. at 97.

Without considering any of Allen's evidence of discrimination, the North Carolina Supreme Court denied Allen's *Batson* claim. In its ruling, the court relied wholly on the fact that the majority of the seated jurors were African American, and dismissed the claim. *See*

served the *Batson* challenge. *See Riley v. Taylor*, 277 F.3d 261, 274 (3d Cir. 2001) (*en banc*). However, the Third Circuit reasoned that since "the last state court to be presented with a particular federal claim reache[d] the merits, it remove[d] any bar to federal-court review that might otherwise have been available." *Riley*, 277 F.3d at 274 (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991)). In *Riley*, the court considered the claim of a defendant who failed to raise either a *Swain* or a *Batson* objection at trial. *Id.* The Delaware Supreme Court, however, reviewed Riley's *Batson* claim on the merits, both on direct appeal and as presented in post-conviction motions. *Id.* The Third Circuit held that, although the defendant failed to raise the claim to the trial court, "Riley's *Batson* claim [was] not procedurally barred . . . ." *Id.* at 275. In Allen's case, the North Carolina Supreme Court similarly considered and rejected Allen's *Batson* claim on the merits. *See State v. Allen*, 372 S.E.2d 855, 861-62 (N.C. 1988).

*Allen*, 372 S.E.2d at 862. Reviewing the facts as presented in the record, I find that this denial "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court." *Frye v. Lee*, 235 F.3d at 903; *see also Keel*, 162 F.3d at 271 (outlining the elements of a *Batson* claim). The Equal Protection Clause forbids a prosecutor from challenging any single potential juror solely on account of that individual's race. *Batson*, 476 U.S. at 89. If the prosecution strikes one African American juror for discriminatory reasons, that alone is sufficient to support a *Batson* challenge, even if other African Americans remain on the jury. By focusing *solely* on the racial make-up of the jury that finally heard Allen's case, the North Carolina Supreme Court never analyzed Allen's evidence of discrimination, in plain contravention of clearly established federal law. Although it was appropriate to take into consideration evidence of who was seated, the court should have focused on those members of the venire who were *excluded* from the jury for allegedly unconstitutional reasons as *Batson* requires.

As contained in the record, Allen's evidence of discrimination is compelling. Out of 66 prospective jurors on the venire, 38 (57.5%) were Caucasian, 24 (36.3%) were African American, and 4 (6%) were of another race. (J.A. at 57.) The prosecution used 84.6% of its peremptory challenges to exclude African Americans from the jury, even though African Americans only represented 36.3% of the venire presented.[3]

---

[3]In addition to this statistical evidence, circumstantial evidence in the record also supports a finding that the prosecution struck some jurors on the basis of race. For example, as jury selection began, the prosecution learned that Juror Thorne, a Caucasian woman in Seat 9, had known defense counsel "through the years as he was growing up," and also knew his parents well. (Tr. of Proceedings, *Allen v. French*, 5:97-HC-959-H, at 103 (N.C. Super. Ct. Nov. 8-13, 1985)). In addition, Thorne had read newspaper accounts of the shooting and pre-trial activity. (Tr. at 99.) Thorne also had a daughter and two grandchildren, (Tr. at 129), and thus might have been especially sympathetic to the testimony of Allen's mother. Despite the possibility that Thorne would be influenced by these factors, the government left her on the jury.

The decision to keep Juror Thorne is particularly suspect when compared to the prosecutor's decision to strike Juror Davis, an African

This Court has previously recognized that a prima facie case of a *Batson* violation can be affirmatively made solely by looking to the statistical evidence of who was peremptorily struck by the prosecution. In *Howard v. Moore*, 131 F.3d 399, 407 (4th Cir. 1997) (*en banc*), we held that a "prosecutor's striking of six out of the seven black prospective jurors constituted a prima facie case of discrimination. Judge Williams, writing for the *en banc* court, logically concluded that strong statistical evidence — without more — *is enough* to establish a *prima facie* case of intentional discrimination under *Batson*.[4] Similarly, in *United States v. Mitchell*, this Court found that when "[t]he prosecution used seven of its ten peremptories to strike black veniremen" and when "a previous jury panel had to be dismissed because of racially inflammatory remarks made in the jurors' lounge" by some of the jurors, "a prima facie *Batson* violation has been made." 877 F.2d 294, 302 (4th Cir. 1989). Accordingly, "[w]hen determining whether a prima facie case of discrimination has been shown, the district court may consider the proportion of black jurors *stricken* compared with the composition of the venire." *United States v. Joe*, 928 F.2d 99, 103 (4th Cir. 1991) (citing *Batson*, 476 U.S. at 97) (emphasis added).

---

American woman in Seat 1. On the record, Davis stated that she knew of one of the defense attorneys, Mr. Graham, but that she and Graham were not friends or acquaintances, and that Graham had never done any legal work for her or any member of her family. (Tr. at 348-49). When asked to clarify what she did know about Graham, Davis stated, "Nothing other than knowing he works up here and seeing him at the store." (Tr. at 348.) Given the prosecution's comfort with Thorne's relationship with defense counsel, it is implausible that the prosecutor was concerned about Davis' tenuous and casual connection with that same lawyer. Additionally, unlike many other jurors, Davis was never asked about her marital status, whether she had any children, or where she might be employed.

[4]The evidence in *Howard* was as follows: "After voir dire, forty-two persons were qualified as jurors, only seven of whom were black. The prosecutor struck six of the seven black prospective jurors and four of the thirty-five white prospective jurors, resulting in a jury of eleven white jurors and one black juror. Howard moved to quash the panel pursuant to *Batson*. The trial court found, and we agree, that the prosecutor's striking of six out of seven black prospective jurors constituted a prima facie case of discrimination." *Howard*, 131 F.3d at 407.

Despite the evidence that race was a factor in the prosecution's use of peremptory challenges, the government insists that no *Batson* violation exists because the jury was 58% African American.[5] (Br. of Appellee, at 23). In addition, the government emphasizes that, in leaving seven African Americans on the jury, "the State did not use all of its peremptory challenges." (Br. of Appellee, at 22). At most, however, this evidence only shows that race may not have been a determinative factor *every* time an African American juror was called to the jury box. It is indisputable that a racially biased use of a peremptory challenge against even a single potential juror violates *Batson*. Therefore, a court is not relieved of its duty to consider all of the relevant evidence simply because some African Americans were seated on the jury, or because *Batson* was observed *some* of the time.

Allen is entitled to habeas relief because the North Carolina Supreme Court flatly refused to consider all of the facts and circumstances of discrimination that Allen proffered; instead, it summarily concluded that "the defendant has not made a prima facie showing of racially motivated peremptory challenges when the State accepted seven of the seventeen black veniremen tendered and the majority of the jury which tried the defendant was black." *Allen*, 372 S.E.2d at 862. The court's reasoning, in its entirety, was as follows:

> In this case the jury before which the defendant was tried consisted of seven black persons and five white persons. Of the seventeen black veniremen tendered to the State (including alternates), it accepted seven or forty-one percent. In *State v. Abbott*, 320 N.C. 475, 358 S.E.2d 365 (N.C. 1987), we held that the defendant did not make a prima facie case of racially motivated peremptory challenges when the State peremptorily challenged three of five black veniremen tendered to it. In *State v. Belton*, 318 N.C. 141, 347 S.E.2d 755 (N.C. 1986), we held an inference that racially motivated peremptory challenges did not arise when the State peremptorily challenged six of the twelve black jurors tendered. In that case the State peremptorily challenged five white jurors.

---

[5]The jury that was initially empaneled was 58% African American. Because one juror was excused for cause mid-trial, the jury that decided Allen's case was 50% African American.

> We hold pursuant to *Abbott* and *Belton* that the defendant has not made a prima facie showing of racially motivated peremptory challenges when the State accepted seven of the seventeen black veniremen tendered and the majority of the jury which tried the defendant was black.

*Id.* In relying on the ratio of African American jurors seated to African American jurors tendered, the North Carolina Supreme Court has turned the *Batson* analysis on its head. Indeed, the *Batson* Court held that "'[a] single invidiously discriminatory governmental act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions.'" 476 U.S. at 95 (quoting *Arlington Heights v. Metro Hous. Dep't Corp.*, 429 U.S. 252, 266 n.14 (1977)).

The Court further outlined the precedential underpinnings of this rule, which stretch back to the nineteenth century case of *Strauder v. West Virginia*, 100 U.S. 303 (1880). The *Batson* Court explained:

> In holding that racial discrimination in jury selection offends the Equal Protection Clause, the Court in *Strauder* recognized . . . that a defendant has no right to a "petit jury composed in whole or in part of persons of his own race." . . . But the defendant does have the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.

476 U.S. at 85 (internal citation omitted). The Court observed that discrimination in jury selection reached beyond the defendant on trial, and noted that "by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror" as well. *Id.* at 87 (citing *Strauder*, 100 U.S. at 308). For these reasons, the Court concluded that "the rule of law will be strengthened if we ensure that *no citizen* is disqualified from jury service because of his race." *Id.* at 99 (emphasis added).

In fact, courts, including this court, interpreting *Batson* around the time of the North Carolina Supreme Court's decision in the instant case (1988) emphasized *Batson*'s focus on the excluded juror. *See, e.g.*, *Joe*, 928 F.2d at 103 ("The district court erred in ruling that a *Batson* violation did not occur since members of the defendants'

racial group were seated on the jury."); *United States v. Lane*, 866 F.2d 103, 105 (4th Cir. 1989) ("As Lane correctly points out, striking only one black prospective juror for a discriminatory reason violates a black defendant's equal protection rights, even when other black jurors are seated and even when valid reasons are articulated for challenges to other black prospective jurors."); *Chisolm v. State*, 529 So. 2d 635, 637 (Miss. 1988) ("Among the few clues *Batson* gives [regarding] how we are to enforce the new claim it announces, we are directed to concentrate on the juror excluded, not those accepted . . . ."); *Fleming v. Kemp*, 794 F.2d 1478, 1483 (11th Cir. 1986) (quoting *Arlington* passage from *Batson* and stating that "nothing in *Batson* compels the district court's conclusion that constitutional guarantees are never abridged if all black jurors but one or two are struck because of their race").

Under the rule proposed by the state court in Allen's case, however, the State could discriminate against some African American jurors (three out of five, for example), as long as others made it through the jury selection process unchallenged. Hypothetically, given this reasoning, Allen's *Batson* challenge would have failed even if the State had used all of its strikes against African Americans because seven African Americans were seated on the jury.

An additional problem with the North Carolina test is that evidence of who is seated on a jury is less probative than evidence of who is struck. A prosecutor only has a limited ability to control who is eventually seated on the jury. The defendant's use of strikes, the court's rulings on motions for cause, and the role of chance in who is pulled from the venire, all greatly affect the final composition of the jury. In light of these factors, a prosecutor seeking to exclude jurors on the basis of race can only do so much. As a result, the best and most direct evidence in a *Batson* challenge is evidence of whom the government chose to strike, because that is something over which the prosecutor has complete and undiluted control.

The North Carolina Supreme Court effectively acknowledged that it erred in applying *Batson* to Allen's case, when, in a later ruling, the court recognized that "the acceptance rate of minorities by the State is relevant to our inquiry, *but it is not dispositive*." *State v. Smith*, 400

S.E.2d 712, 724 (N.C. 1991) (emphasis added). The *Smith* court explained:

> When a district attorney uses all his peremptories, discriminatorily or not, he will be forced to accept replacement jurors regardless of their race. Under such facts the acceptance rate would have little to do with the district attorney's actual intent to discriminate. Further, the presence of an intent to discriminate may be proved by a number of factors or circumstances, not just the acceptance rate of black jurors.

*Id.* Similarly, this Court has ruled, "Although the [trial] court was entitled to consider the fact that the final jury included black citizens, it was not entitled to allow the presence or absence of other black jurors to resolve the question of whether [the civil defense attorney] was motivated by race in the exercise of this particular strike." *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir. 1995).

Because of *Batson*'s focus on a "single invidiously discriminatory governmental act," 476 U.S. at 95, this Court has held that a "district court erred in ruling that a *Batson* violation did not occur since members of the defendants' racial group were seated on the jury." *Joe*, 928 F.2d at 103. Writing for the majority, Judge Wilkins astutely observed, "while the fact that black jurors were seated is entitled to substantial consideration, it is not dispositive of this issue and does not preclude a finding that defendants established a prima facie violation of *Batson*." *Id.* Along the same lines, we have previously held that "the racial composition of the actual petit jury is not dispositive of a *Batson* challenge . . . ." *United States v. Grandison*, 885 F.2d 143, 147 (4th Cir. 1989) (Wilkinson, J., writing for the majority). That is, we have unequivocally ruled that an allegation of a *Batson* violation cannot be rebutted solely by relying on who was eventually seated on the jury.

Yet in approving of the North Carolina Supreme Court's *Batson* analysis, the majority curiously departs from *Batson* and its progeny and also appears to contravene the Supreme Court's most recent equal protection jurisprudence, which rests largely upon the concept of racial balancing and proportionality. *See e.g.*, *Grutter v. Bollinger*,

539 U.S. 306, 123 S. Ct. 2325 (2003) (majority and dissenting opinions discuss the ineffectiveness and unconstitutionality of racial balancing and proportional racial representation).

The majority devotes *much* "attention to numbers" by placing undue emphasis on the number of African American jurors before which Allen was tried as justification for foreclosing Allen's *Batson* challenge. *Contra id.* at 2343 ("'[S]ome attention to numbers,' without more, does not transform a flexible . . . system into a rigid quota." (citation omitted)). For instance, the majority writes:

> The North Carolina Supreme Court rejected the *Batson* challenge based on the facts that (1) "the State accepted seven of the seventeen black veniremen tendered" and (2) "the majority of the jury which tried the defendant was black." The court concluded that in the circumstances where the State "accepted seven or forty-one percent" of the African-American members of the venire, an "inference" of racial motivation did not arise, and the defendant failed to make a *prima facie* case that the State's peremptory challenges were racially motivated.

*Ante* at 11 (citations omitted). Speciously, the majority characterizes as "selective" my use of Allen's proffered statistics demonstrating the prosecution's overwhelming and disproportionate use of its peremptory strikes to remove African American jurors. Yet, in response, the majority posits that those statistics support the "opposite inference." *Ante* at 16.

First, I note that if the proffered statistics "support" competing inferences, a *prima facie* case exists, and thus merits further fact finding, contrary to the majority's conclusion that no *prima facie* case exists. *See Ante* at 15. Second, I take issue with the majority's conclusion that no inference of discrimination arose under these facts because "the percentage of African-Americans accepted by the State and seated on the jury — 58% (7 of 12) — exceeded the percentage of African-Americans on the venire — 37% (24 of 65) — and exceeded the percentage of African-Americans in the county — 48%." *Ante* at 16. Such a conclusion suggests that because roughly half of the petit jury was black, the exclusion of even one juror for

racially prejudiced reasons is constitutional. This would create a "quota" system whereby a jury comprised of a fixed number of minorities, could never violate the Equal Protection Clause. Under such a system, no equal protection challenge could succeed against a jury where the racial makeup thereof is proportionate to or greater than the racial makeup of the county in which it sits. Relying upon a voir dire process that produces a jury that consists of a specified number of jurors of a particular race — roughly half, for example — is no doubt the "functional equivalent of a quota." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 317-18 (1978). The Supreme Court has clearly held that quotas and race-balancing are inappropriate and unacceptable in the equal protection context. *Bakke*, 438 U.S. at 317-18; *see also Grutter*, 123 S. Ct. at 2371 (Kennedy, J., dissenting).

The majority goes even further by concluding that no harm was done because "[i]n accepting these African-American jurors, the State left unused peremptory challenges that were available to it." *Ante* at 15.[6] I suppose that because only a few African American venire members were excluded while others remained, the Defendant and those selected have no cause to complain? It seems that the majority counsels us to ignore the harm worked upon all members of society (minority and non-minority alike) by the exclusion of even one juror on the basis of race, so long as a racial balance is achieved in the process. I doubt that those excluded and deprived of their constitutional right to serve upon a jury "all by reason of their skin color will surely understand." *Grutter*, *supra*, at 2349 (Scalia, J., dissenting).

By ignoring evidence that establishes a prima facie case of discrimination, and by relying solely on evidence that, standing alone, cannot possibly be dispositive, the North Carolina Supreme Court has applied a test that brazenly disregards the Supreme Court's ruling in *Batson*. I would therefore remand the case to the district court so that it may, in its discretion, hold a hearing on petitioner's *Batson* claim (and if warranted by that hearing, order a new trial) or return the case

---

[6]The majority also notes that "[o]nly on Seat 3 did the State's exercise of a peremptory challenge result in the race of a juror changing from African-American to white. [and] conclude[d] that this 'pattern' supports an inference that discrimination against African-Americans was not a reason for the State's exercise of peremptory challenges." *Ante* at 15.

to the state trial court on a conditional writ of habeas corpus so that the state court can conduct its own inquiry. *See Tankleff v. Senkowski*, 135 F.3d 235, 250 (2d Cir. 1998); *see also Howell v. Barker*, 904 F.2d 889, 896 (4th Cir. 1990) (granting writ conditioned on failure of state to retry defendant by date set by district court).

For these reasons, I respectfully dissent from the court's opinion in Part V.